ANTONIO CLASS DOWNING, querellante y recurrido, *v.* VEHICLE EQUIPMENT LEASING COMPANY h/n/c VELCO, querellado y peticionario, y DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, agencia recurrida; POPULAR LEASING & RENTAL, INCORPORADO, querellada y peticionaria, *v.* ELIZABETH DE JESÚS COLÓN, querellante y recurrida; MIRIAM CÁCERES TABOAS y ALEJANDRO E. LÓPEZ GALIÑARES, querellantes y recurridos, *v.* BANSANDER LEASING CORPORATION, querellada y peticionaria; POPULAR LEASING & RENTAL, INCORPORADO, querellada y recurrente, *v.* DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, agencia recurrida, y RUTH E. SANTIAGO RODRÍGUEZ, querellante y recurrida.

*Números:* CE-94-421    *Resueltos:* 20 de mayo de 1997
CE-94-423
CE-94-424
CT-96-1

*José Ricardo Díaz Ríos*, de *Pérez Pietri & Díaz Ríos*, abogado de Vehicle Equipment Leasing Company (Velco), parte peticionaria; *Sergio Domínguez Wolff*, del *Bufete S. Domínguez Wolff*, y *Víctor Landrau Alexander*, abogados de Popular Leasing & Rental, Inc., parte peticionaria; *Félix R. Figueroa Cabán*, de *González Oliver, Correa Calzada, Collazo Salazar, Herrero & Jiménez*, abogado de Bansander Leasing Corporation, parte peticionaria; *Ana María López Erquicia* y *Antonio M. Del Toro Sánchez*, abogados del Departamento de Asuntos del Consumidor, parte recurrida.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

En los casos consolidados del epígrafe, la controversia gira en torno a si es equiparable el contrato de arrendamiento financiero conocido como *leasing* al de venta condicional o al de venta al por menor a plazos, por lo que le sería aplicable lo dispuesto en el Art. 6(a) de la Ley Núm. 61 de 13 de abril de 1916, según enmendada, conocida como la Ley de Ventas Condicionales, 10 L.P.R.A. ant. sec. 36(a), a los efectos de que el acreedor que haya optado por la reposesión de un artículo, que sea objeto de una venta condicional, o haya aceptado la entrega voluntaria de tal artículo quedará impedido de instar posteriormente una acción para el cobro de dinero contra el deudor, y deberá elegir entre uno o el otro de estos remedios. Veamos.

## I

Se encuentran ante nos varios casos consolidados que presentan la misma controversia de derecho. En todos y cada uno de ellos, el contrato —que ha sido objeto de la controversia— es de arrendamiento financiero (*lease agreement*), redactado en similares términos.

Cada contrato básicamente establecía que, además del canon de arrendamiento, el arrendatario tenía la obligación de pagar todas las costas, los gastos, los aranceles, las multas, los cargos, los impuestos relacionados con la adquisición (excepto los impuestos sobre ingresos o patentes por franquicia), la propiedad, las licencias, el arrendamiento, el registro, el título, la entrega, la posesión, el uso o la operación del vehículo. También se establecía que el arrendador retenía la obligación de pagar los gastos asociados a la inscripción, al título y a la tablilla del vehículo, pero que podría requerirse al arrendatario que reembolsara dichos gastos.

Además, cada contrato disponía que el arrendatario tenía la obligación de pagar por todos los gastos de reparaciones del automóvil, incluyendo aceite y lubricación, gaso-

lina, piezas y materiales, reparaciones y mano de obra, llantas y tubos, estacionamiento y almacén, peajes, multas y penalidades, y arrastre. Se establecía que todos los riesgos de pérdida del vehículo correspondían al arrendatario.

Contenían, además, una cláusula que establecía que al cumplirse el término del arrendamiento, el vehículo debía ser entregado por el arrendatario para propósitos de su venta. Disponía que si el producto de la venta excedía el valor residual fijado en el contrato, el arrendador habría de pagar al arrendatario la diferencia, siempre y cuando el arrendatario no hubiese incurrido en mora. En cambio, si el producto de la venta fuese menor que el valor residual, el arrendatario se obligaba a satisfacer la diferencia al arrendador.

Además, cada contrato disponía que el negocio era un *lease* y no una venta; que cada unidad pertenecía al arrendador y que el arrendatario no tenía ningún derecho, título o interés en éste, así como tampoco tenía una opción para comprar la unidad en cualquier momento.

Asimismo se establecía que, en caso de incumplimiento en el pago de los cánones, el arrendador tendría derecho a efectuar la reposesión de la unidad, debiendo el arrendatario pagar el balance de los cánones pactados durante todo el término del arrendamiento. Contenía, además, una cláusula en la cual se expresaba que la unidad sería utilizada para fines de negocios, comerciales o agrícolas, y no para fines personales, de familia o domésticos, y que el contrato no constituía un *lease* de consumidor bajo el *Consumer Leasing Act* de 1976.

Veamos, pues, los hechos específicos que dan base a cada uno de los casos pendientes ante nos.

A. En el caso *Antonio Class Downing v. Vehicle Equipment Leasing Co. h/n/c Velco; DACO*, Núm. CE-94-421, el 10 de noviembre de 1988 el arrendatario señor Class Downing suscribió un contrato de arrendamiento financiero con Velco para el arrendamiento de un vehículo marca Porsche

de 1988, acordando un canon mensual de cuatrocientos setenta y nueve dólares ($479) por un término de sesenta (60) meses, con un valor residual de cuatro mil quinientos siete dólares con veinte centavos ($4,507.20). El arrendatario estuvo utilizando el automóvil por treinta y tres (33) meses, hasta que el 10 de octubre de 1990 lo entregó voluntariamente a Velco.

Así las cosas, el 24 de enero de 1991 Velco notificó al arrendatario que el balance de su cuenta ascendía a dieciséis mil quinientos cincuenta y un dólares con veinticinco centavos ($16,551.25) y, además, le indicó que la mejor oferta conseguida por el vehículo había sido de cinco mil quinientos dólares ($5,500), otorgándole al arrendatario un plazo de cinco (5) días para obtener un precio superior. Se le advertía que, en caso contrario, Velco habría de vender el vehículo por esa suma, cobrándole la diferencia de once mil cincuenta y un dólares con veinticinco centavos ($11,051.25).

Una segunda notificación de esta advertencia le fue cursada al arrendatario el 15 de abril de 1991. Ninguna de estas comunicaciones fue contestada por el arrendatario, por lo que Velco procedió a vender el automóvil por el precio informado y a reclamar al arrendatario el balance. Ante tal situación, el arrendatario presentó una querella contra la arrendadora ante el Departamento de Asuntos del Consumidor (en adelante D.A.Co.).

B. En cuanto al caso *Popular Leasing & Rental, Inc. v. Elizabeth De Jesús Colón*, Núm. CE-94-423, el 29 de enero de 1990 la arrendataria señora De Jesús suscribió un contrato de arrendamiento financiero (*lease*) con Popular Leasing, mediante el cual esta última aceptó comprar un vehículo marca Honda Civic LX de 1990, para darlo en arrendamiento a la señora De Jesús. El costo de adquisición para la arrendadora fue de quince mil trescientos setenta y tres dólares ($15,373). La arrendataria se obligó a arrendar el vehículo por un término mínimo de sesenta

(60) meses, a base de un canon mensual de cuatrocientos doce dólares ($412), fijándose un valor residual de tres mil quinientos dólares ($3,500).

La arrendataria tomó posesión del automóvil en febrero de 1990. Para abril de 1992, la arrendataria comenzó a experimentar dificultades, y al 29 de mayo de 1992 adeudaba la suma de ochocientos cuarenta y seis dólares con catorce centavos ($846.14), por lo que decidió entregar de forma voluntaria el vehículo a Popular Leasing.(¹) Ese mismo día, Popular Leasing le envió una comunicación donde le informaba a la arrendataria que tenía diez (10) días para pagar el atraso en su cuenta o que, de lo contrario, se procedería a la venta del automóvil. La carta advertía a la arrendataria que el vehículo había sido tasado en seis mil dólares ($6,000), pero que la liquidación del contrato ascendía a la suma de doce mil seiscientos dieciséis dólares con sesenta y ocho centavos ($12,616.68), por lo que se le brindaba la oportunidad de obtener otras ofertas que mejorasen la cantidad de la tasación.

El vehículo fue eventualmente vendido por la suma de seis mil dólares ($6,000) y, al persistir Popular Leasing en su reclamo sobre el pago del balance del contrato, la arrendataria acudió ante D.A.Co., presentando una querella en contra de ésta.

C. En el caso *Miriam Cáceres Taboas, et al. v. Bansander Leasing Corp.*, Núm. CE-94-424, los Srs. Alejandro López y Miriam Cáceres suscribieron el 16 de noviembre de 1989 un contrato de arrendamiento financiero con Leaseway of Puerto Rico, Inc. para el arrendamiento de un vehículo marca Mazda 323 DX de 1989, por un término de

---

(¹) Al entregar cada vehículo, la arrendataria firmó un documento en el que expresaba:

"Reconozco que la entrega voluntaria de esta(s) unidade(s) no me releva de los términos y condiciones del contrato de arrendamiento ('Lease Agreement') por mí suscrito, ni de mis obligaciones bajo el mismo. Reconozco, además, que tengo la obligación de continuar pagando las mensualidades hasta que se efectúe la venta y que soy responsable de cualquier pérdida que pueda surgir en la(s) referida(s) transacción(es)." Apéndice, pág. 6.

sesenta (60) meses, a base de un canon mensual de trescientos doce dólares ($312) y un valor residual de dos mil doscientos ocho dólares ($2,208). El costo capitalizado del automóvil era de once mil quinientos veintinueve dólares ($11,529). Dicho contrato fue cedido por Leaseway a Bansander Leasing el 1ro de julio de 1991.

Los arrendatarios hicieron veintiún (21) pagos sobre el vehículo, y el 25 de agosto de 1992 lo entregaron de forma voluntaria.[2] La arrendadora, Bansander Leasing, aceleró el vencimiento del contrato y ascendió su valor de liquidación a once mil cuatrocientos cincuenta y nueve dólares con veinticuatro centavos ($11,459.24). El 2 de octubre de 1992, Bansander Leasing vendió el automóvil por la mejor oferta recibida, esto es, la suma de cinco mil doscientos dólares ($5,200).

Así las cosas, el 22 de agosto de 1992 Bansander Leasing le reclamó a los arrendatarios el balance de seis mil doscientos cincuenta y nueve dólares con veinticuatro centavos ($6,259.24). Ante tal situación, los arrendatarios acudieron ante D.A.Co., presentando una querella contra Bansander Leasing.

D. Por último, en el caso *Popular Leasing & Rental, Inc. v. DACO, Ruth Santiago Rodríguez*, Núm. CT-96-1,[3] la Sra. Ruth E. Santiago Rodríguez suscribió un contrato de arrendamiento financiero (*lease agreement*) con Popular Leasing el 31 de mayo de 1990, mediante el cual esta última se obligó a comprar, para dar en arrendamiento a la primera, un vehículo marca Peugeot de 1989, escogido por la primera. Se obligó la arrendataria a pagar un canon

---

[2] Firmaron un documento en el cual reconocían que "[e]sta entrega ... no constituye un abono, pago, liberación o extinción ya sea total o parcial de la obligación que surja del contrato de arrendamiento ...". Apéndice III, pág. 7.

[3] Mediante la Solicitud de Certificación Núm. CT-96-1 que fue presentada ante este Tribunal el 3 de enero de 1996, el Tribunal de Primera Instancia solicitó que en el caso *Popular Leasing & Rental, Inc. v. DACO, Ruth Santiago Rodríguez*, Núm. KAC-94-1728, pendiente ante dicho foro, fuera expedido un auto de certificación, a los fines de que éste fuera resuelto directamente por este Tribunal, considerando la existencia de casos pendientes ante nos con la misma controversia de derecho; esto es, si el contrato de *leasing* era equiparable al de venta condicional.

mensual de trescientos veintisiete dólares ($327) por un término de sesenta (60) meses, con un valor residual de seis mil quinientos dólares ($6,500).

La arrendataria tomó posesión del vehículo en junio de 1990, y para enero de 1992 comenzó a experimentar dificultades. Así las cosas, al 8 de junio de 1992 adeudaba la suma de mil seiscientos noventa y ocho dólares con setenta centavos ($1,698.70), por lo que ésta decidió entregar voluntariamente el vehículo a la arrendadora, Popular Leasing. El 10 de junio de 1992, Popular Leasing le envió una comunicación a la arrendataria para informar que tenía diez (10) días para pagar el atraso en su cuenta o que, de lo contrario, se procedería a la venta del automóvil. Le informó, además, que el vehículo había sido tasado en seis mil dólares ($6,000), pero que la liquidación del contrato ascendía a la suma de diecisiete mil setenta y nueve dólares con sesenta y nueve centavos ($17,079.69), por lo que se le brindaba la oportunidad de obtener otras ofertas que mejorasen la cantidad de la tasación, para así minimizar cualquier pérdida que surgiese entre el balance de liquidación y la venta de la unidad.

Posteriormente, mediante Carta de 20 de abril de 1993, Popular Leasing le notificó a la arrendataria la venta del vehículo, existencia de un balance por la suma de nueve mil ochocientos sesenta y nueve dólares ($9,869) y le requirió el pago del referido balance.

Ante tal situación, el 18 de mayo de 1993 la arrendataria presentó una querella contra Popular Leasing ante D.A.Co., en la cual solicitó, entre otras cosas, que se le relevara del pago de nueve mil ochocientos sesenta y nueve dólares ($9,869).

## II

En todas las querellas D.A.Co. resolvió que el contrato de arrendamiento financiero estaba cubierto dentro de la

definición de contrato de venta al por menor a plazos, establecida en el Art. 101(6) de la Ley Núm. 68 de 19 de junio de 1964, según enmendado por la Sec. 1(6) de la Ley Núm. 9 de 4 de marzo de 1976, conocida como la Ley de Ventas a Plazos y Compañías de Financiamiento, 10 L.P.R.A. sec. 731 (Sup. 1977).[4] Dicho artículo definía, en lo pertinente, el contrato de venta al por menor a plazos de la manera siguiente:

> ... [C]ualquier acuerdo convenido en Puerto Rico, incluyendo ... [un] contrato de venta condicional o cualquier otro documento evidenciario de un acuerdo para pagar el precio de venta al por menor a plazos de mercancía o servicios en el transcurso de un período determinado de tiempo. *También incluye cualquier arrendamiento de mercancía mediante el cual el arrendatario convenga en pagar como compensación por el uso de la mercancía una suma sustancialmente equivalente a su valor, o en exceso de éste, y por el cual se convenga que el arrendatario estará obligado a, o tiene la opción de, convertirse en dueño después de cumplir con los términos del contrato.* (Énfasis suplido.)

A base de lo anterior, concluyó dicho foro administrativo que la entrega del vehículo por el arrendatario y la aceptación voluntaria por la arrendadora le impedían a ésta última instar una acción de cobro por la diferencia entre el balance de su cuenta y el precio de venta de la unidad, a base del Art. 6(a) de la Ley Núm. 61, según enmendada, conocida como la Ley de Ventas Condicionales, *supra.* Éste disponía que:

> (a) El acreedor podrá optar entre la reposesión del artículo objeto del contrato de compraventa condicional y la acción judicial en cobro de dinero. De optar por la reposesión, se entenderá que el acreedor ha renunciado a llevar una acción en cobro de dinero contra el deudor en el contrato de compraventa condicional. Para los fines de este Capítulo la entrega voluntaria del artículo, con el consentimiento del acreedor, tendrá el

---

[4] Posterior a los hechos que dan base a esta controversia, dicho inciso fue enmendado mediante la Ley Núm. 60 de 11 de agosto de 1994 (10 L.P.R.A. sec. 731), según discutiremos más adelante.

mismo efecto de una reposesión. Todo pacto en contrario se considerará nulo. 10 L.P.R.A. sec. 36(a) (Sup. 1977).

Así las cosas, en los Casos Núms. CE-94-421, CE-94-423 y CE-94-424, las arrendadoras acudieron ante el extinto Tribunal Superior de Puerto Rico, el cual confirmó las resoluciones recurridas.([5]) Mediante Sentencia de 4 de mayo de 1994, el tribunal de instancia concluyó que los contratos de arrendamiento financiero están sujetos a las disposiciones de ley contenidas en el Art. 6(a) de la Ley de Ventas Condicionales, *supra*, por lo que las arrendadoras, al aceptar voluntariamente los vehículos que fueron objeto de los negocios, estaban impedidas de reclamar el pago del balance de los contratos. En la alternativa, concluyó que aun al denegarse la equivalencia entre los contratos de *lease* y la venta condicional, D.A.Co. tenía discreción para moderar la cláusula penal de aceleración de los pagos, limitando, según lo hizo, la compensación de las arrendadoras al valor obtenido por la venta de los automóviles.

No conformes, acudieron ante nos las arrendadoras y, en síntesis, plantean que erró el tribunal de instancia al equiparar el contrato de *leasing* a lo que nuestro ordenamiento caracteriza como una venta condicional y al determinar, en la alternativa, que la cantidad reclamada a los arrendatarios está basada en una cláusula penal y, como tal, D.A.Co., al igual que los tribunales, tienen la autoridad para reducir o limitar la responsabilidad de los arrendatarios.

Mediante Resolución de 12 de agosto de 1994, consolidamos las peticiones de *certiorari* y expedimos los recursos a fin de revisar la sentencia dictada en ellos.

Por su parte, en el Caso Núm. CT-96-1, Popular Leasing acudió ante el Tribunal de Primera Instancia mediante una petición de revisión, el cual a su vez solicitó a este Tribunal la expedición de un auto de certificación. Mediante la Resolución de 24 de enero de 1996, expedimos el

---

([5]) El caso fue referido ante la Unidad Especial de Jueces de Apelaciones, Hon. German J. Brau Ramírez, la cual los consolidó.

correspondiente auto y consolidamos el recurso con los casos pendientes ante este Tribunal, en los que se plantea la misma controversia de derecho.

Habiéndose perfeccionado los recursos y con el beneficio de los autos originales de los casos y la comparecencia de las partes, resolvemos.

### III

El tratadista Luis Rojo Ajuria, en su obra *"Leasing" Mobiliario*, Madrid, Ed. Tecnos, 1987, Cap. 1, pág. 28, nos describe la operación de *leasing* de la forma siguiente:

> ... 1) elección del material y suministrador por parte del futuro usuario; 2) presentación de la solicitud de *leasing*; 3) examen de la solicitud y estudio sobre el cliente por parte de la empresa de *leasing*; 4) una vez realizado el estudio anterior, la empresa de *leasing* propone al posible usuario las condiciones generales y particulares de toda operación y, llegados a un acuerdo, se firma por ambos el contrato de *leasing*; 5) la empresa de *leasing* adquiere del proveedor (fabricante o distribuidor) el material que designó previamente el usuario; 6) se entrega el material al usuario en régimen de arriendo; 7) el arrendamiento tiene un determinado plazo de carácter irrevocable, llegado el cual al usuario se le presentan tres opciones: a) devolver el material a la empresa de *leasing*, que es propietaria; b) convenir un nuevo arrendamiento; c) adquirir el material en un precio previamente establecido.

Este Tribunal, en *Meyers Bros. v. Gelco*, 114 D.P.R. 116, 121 (1983), tuvo la oportunidad de analizar la institución del *leasing*, señalando sobre el particular:

> ... [E]l contrato de leasing ... posee elementos de otras figuras, pero se diferencia de ellas. No puede en verdad equipararse totalmente, como a veces se ha intentado, al arrendamiento puro, ni al arrendamiento-venta, ni al depósito, ni al préstamo, ni a la estipulación en favor de tercero, ni a otras figuras familiares afines, aunque a veces comparta características semejantes. Ninguno de estos vestidos provee la talla justa. La opinión más generalizada al presente, la cual suscribimos, es

que se trata de un contrato atípico, *sui géneris*, producto de la realidad cambiante del tráfico mercantil .... (Citas omitidas.)

## Señalamos, además, que:

El contrato de arrendamiento financiero no es objeto de regulación especial alguna en Puerto Rico. Se rige, en consecuencia, por el principio de la autonomía negocial, consagrado por el Art. 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372, equivalente al 1255 del Código Civil español. *Meyers Bros. v. Gelco*, supra, pág. 123. (Escolio omitido.) Véase, además, *Nieves Vélez v. Bansander Leasing Corp.*, 136 D.P.R. 827 (1994).

Tal figura del *leasing* ha sido estudiada por varios tratadistas. En particular, Manuel Gutiérrez Viguera nos resume las principales diferencias entre el *leasing* y las operaciones de ventas a plazos de la forma siguiente:

A) En las ventas a plazos se adquiere un derecho de propiedad en potencia durante la vigencia del contrato, mientras que el leasing está limitado al uso del bien.

B) En el leasing el pago inicial es mínimo y en ocasiones inexistente, mientras que en las ventas a plazos suele representar un porcentaje significativo.

C) En las ventas a plazos existe transmisión definitiva de la propiedad al expirar el contrato; sin embargo, en el leasing se presenta toda una serie de alternativas ... [adquirir el bien por un precio previamente establecido; devolver el bien; prorrogar el alquiler (o sea, renovarlo)]. M. Gutiérrez Viguera, *El Leasing como Institución Financiera*, Madrid, Asociación para el Progreso de la Dirección, 1977, pág. 37.

## Dicho tratadista también señala que:

Evidentemente, como muy bien señala MARTÍN OVIEDO,[6] "la finalidad del leasing no es vender a plazos, ni tampoco financiar operaciones de ese tenor, sino financiar el uso de bienes, siendo diferente la propiedad de los mismos. En tal sentido, el leasing que hemos incluido como arrendamiento supera en puridad los límites clásicos de éste, en cuanto que las partes no centran su atención en la propiedad del bien, sino en su mera utilización, disociando aquélla de ésta".

---

[6] J.M. Martín Oviedo, *El leasing ante el Derecho español*, Madrid, Ed. Derecho Financiero, 1972, págs. 72–73.

Cierto, como sigue indicando dicho autor, "que es cláusula típica del leasing la opción de compra del bien arrendado por el usuario, pero cláusula típica, aunque no consustancial. Y cierto también que, si la opción se ejerce, el usuario satisface entonces tan sólo un valor residual, imputándose de hecho lo satisfecho por arriendo a la adquisición de la propiedad de aquél. Pero ello no nos debe hacer pensar que, siquiera cuando se produzca el ejercicio de la opción, el leasing se equipara a una venta a plazos. Y ello, básicamente, porque no puede presumirse, ni mucho menos, que el usuario tuviera voluntad de comprar al suscribir el contrato de leasing; esa voluntad, de hecho, suele formarse con el decurso y, más normalmente, al concluir la operación de arriendo, a la luz de múltiples factores".

Estos factores, decisivos para el ejercicio de la opción de compra, dependerán del grado de obsolescencia de los bienes arrendados, así como de las circunstancias específicas del usuario en ese momento: situación financiera, planes de producción, estrategia comercial, etc. Por lo que difícilmente puede apreciarse en el usuario una voluntad previa de compra. (Énfasis suprimido.) Gutiérrez Viguera, *op. cit.*, págs. 108–109.

## IV

Por otro lado, posterior a la presentación de los casos de autos, fue aprobada por nuestra Asamblea Legislativa la Ley Núm. 76 de 13 de agosto de 1994, conocida como la Ley para Regular los Contratos de Arrendamientos de Bienes Muebles, 10 L.P.R.A. sec. 2401 *et seq.* Asimismo fue aprobada la Ley Núm. 60, *supra*, a los efectos de eliminar de la definición de contrato de venta al por menor a plazos, contenida en el Art. 101(6) de la Ley de Ventas a Plazos y Compañías de Financiamiento, *supra*, la referencia a los arrendamientos de mercancía mediante una compensación por uso sustancialmente equivalente a su valor o en exceso de éste.[7]

Surge de la Exposición de Motivos de la Ley Núm. 60, *supra*, que:

---

[7] Si bien es cierto que ambas leyes no aplican al caso de autos por éstas haberse aprobado con posterioridad a los hechos que dan base a la controversia, las expresiones contenidas en sus historiales legislativos resultan pertinentes en tanto discuten el estado de derecho anterior a su aprobación.

> El intentar enmarcar los arrendamientos dentro del contrato de venta al por menor a plazos ha creado confusión tanto en el usuario como en la industria, dada la forma como está estructurada la Ley Núm. 68.[8] Ello se debe a que esta figura, a pesar de que constituye una forma de financiamiento, goza de unas características particulares. Esto ha ocasionado dificultad en la fiscalización del cumplimiento con la misma.
>
> Es por ello que fue necesario crear nueva legislación, con el objeto de cubrir dicha figura .... 1994 Leyes de Puerto Rico 301.

Cabe aclarar que aun cuando en la Exposición de Motivos de la Ley Núm. 60, *supra,* se indica que anterior a esa ley aplicaba la Ley Núm. 68, *supra,* a los contratos de arrendamiento, ello resulta incorrecto en cuanto al arrendamiento financiero, puesto que según resolviéramos en *Meyers Bros. v. Gelco,* supra, este contrato no era objeto de regulación especial alguna en Puerto Rico. Nótese que a igual conclusión llegó el Secretario de Justicia en su Informe sobre el P. de la C. 702 de 15 de marzo de 1994, 12ma Asamblea Legislativa, 3ra Sesión Ordinaria, con relación al proyecto de ley que se convirtió en la Ley para Regular los Contratos de Arrendamientos de Bienes Muebles. Sobre el particular, señaló en el referido Informe, pág. 1, que "[s]e informa que la legislación vigente no regula este tipo de contrato". Véase, además, en iguales términos los Informes de las Comisiones de Asuntos del Consumidor de la Cámara de Representantes y el Senado de Puerto Rico de 21 y 24 de junio de 1994, respectivamente.

Resulta ilustrativo el Informe de la Asociación de Bancos de Puerto Rico de 15 de marzo de 1994 sobre el P. de la C. 702, que luego se convirtió en la Ley Núm. 76, *supra,* que regula en la actualidad el arrendamiento de bienes muebles. Originalmente el proyecto de ley proveía que el arrendatario, en caso de incumplimiento, podía entregar el bien o acreditar los pagos de los cánones pendientes a opción del arrendador. Ello fue modificado a los fines de recoger las recomendaciones de la Asociación de Bancos de

---

[8] Ley de Ventas a Plazos y Compañías de Financiamiento.

Puerto Rico.(⁹) Sobre el particular, ésta señaló en su Informe, *supra*, págs. 22–23:

> El Proyecto de Ley dispone que el Arrendatario en caso de incumplimiento podrá entregar el bien o acreditar los pagos de los cánones pendientes a opción del Arrendador.
> La entrega del bien previa a la terminación del contrato o el pago de las sumas pendientes no cubre los costos y gastos incurridos por el Arrendador. A diferencia de la Venta Condicional el "leasing" acomoda el pago a efectuarse por el Arrendatario bajo el contrato como función de tres elementos: cánones, término y valor residual. La entrega del bien en caso de incumplimiento no compensa al Arrendador adecuadamente su riesgo ya que como función del valor residual se ha pospuesto el pago de unas sumas para el futuro. Sometemos que el Arrendatario debe de ser responsable por su obligación total según pactada. El equiparar el "leasing" con la Venta Condicional es incorrecto y no fomenta el desarrollo de este importante medio de financiamiento. ...
> Entendemos necesario añadir entre las sumas a pagarse la totalidad de los cánones adeudados bajo el contrato de arrendamiento y cualquier otra cantidad adeudada. El riesgo que se asume en los arrendamientos financieros es distinto a los casos de Venta Condicional. El contrato a su vencimiento compensa los gastos, costos y riesgos incurridos durante el proceso.

Con relación a esa misma disposición, el Comisionado de Instituciones Financieras, en su Informe de 11 de abril de 1994 sobre el P. de la C. 702, pág. 8, señaló, en lo pertinente:

> Tal y como está redactado el artículo puede entenderse que si se entrega el bien voluntariamente se consideraría la entrega como una dación en pago. Desconocemos si esta es la intención del proyecto. De ser esa la intención el Arrendador perdería la inversión si el bien no puede ser vendido. Debemos señalar que existen bienes que se arriendan que son sofisticados u otros que se tornan obsoletos al pasar dos o tres años. En tales casos no pueden ser vendidos y el arrendador sufriría una pérdida.

Cabe señalar que la posición de D.A.Co. en su Informe de 3 de marzo de 1994, sobre el P. de la C. 702, pág. 5, fue:

---

(⁹) Actualmente equivale al Art. 24 de la Ley Núm. 76 de 13 de agosto de 1994 (10 L.P.R.A. sec. 2422).

El Departamento mantiene su posición, de que una vez el arredador opte por reposeer el bien arrendado, o lo reciba voluntariamente debe estar impedido de llevar cualquier otra acción en contra del arrendatario.

No obstante dicha posición no prevaleció, siendo acogida la de la Asociación de Bancos y del Comisionado de Instituciones Financieras.

De otra parte, el Informe de la Comisión de Asuntos del Consumidor de la Cámara de Representantes de 21 de junio de 1994 sobre el P. de la C. 702, pág. 19, señala:

Usualmente en este tipo de negocios [*leasing*] la persona interesada en un bien, solicita a un tercero que lo compre a un proveedor y se lo arriende bajo determinadas condiciones. Este tipo de contrato es muy diferente al arrendamiento diario y a la venta condicional a plazo por lo que no debe confundirse el arrendamiento de bien mueble con ninguno otro tipo de contratos. El P. de la C. 702[10] regirá exclusivamente los "leasing" en todas sus modalidades.

## V

De todo lo anterior podemos colegir que el contrato de arrendamiento financiero conocido como *leasing* no es equiparable al contrato de venta condicional.

En primer lugar, según indicáramos en *Meyers Bros. v. Gelco*, supra, al momento de los hechos que dan base a la esta controversia no había regulación especial alguna que aplicara a los contratos de arrendamiento financiero, sino que éstos se regían por el principio de la autonomía negocial que está consagrado en el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3371. Allí hicimos claro que el arrendamiento financiero no podía equipararse totalmente a otras figuras familiares afines, aunque a veces comparta características semejantes, ya que ninguno de estos vestidos provee la talla justa.

---

[10] Dicho proyecto se convirtió en la Ley Núm. 76, *supra*, 10 L.P.R.A. sec. 2401 *et seq.*

■ Asimismo, nótese que en el arrendamiento financiero (*leasing*) el pago inicial es mínimo, se pacta el uso del bien y no equivale a una transmisión definitiva de la propiedad al expirar el contrato, puesto que en el arrendamiento financiero se presenta una serie de alternativas. No puede presumirse que el arrendatario tuviera la voluntad de comprar al suscribir el contrato, debido a que esa voluntad suele formarse al concluir la operación de arriendo, en aquellos casos en que el arrendatario decide pagar el valor residual pactado en el contrato. Además, en el contrato de arrendamiento financiero la entrega del bien en caso de incumplimiento no compensa adecuadamente al arrendador su riesgo e inversión.

Por ende, erraron tanto D.A.Co. como el tribunal de instancia al aplicar a los casos de autos el Art. 101(6) de la Ley de Ventas a Plazos y Compañías de Financiamiento, *supra*, y el Art. 6(a) de la Ley de Ventas Condicionales, *supra*.

## VI

De otra parte, aducen las arrendadoras que erró el tribunal de instancia al determinar en la alternativa que la cantidad reclamada a los arrendatarios está basada en una cláusula penal y como tal el D.A.Co., al igual que los tribunales, tiene autoridad para reducir o limitar la responsabilidad de éstos. Alegan que la cláusula es principal y no penal, que no tiene un fin coercitivo sino que sólo pretende que la arrendadora recupere su inversión. Veamos.

■ Conforme al Art. 1106 del Código Civil, 31 L.P.R.A. sec. 3131, la pena sustituye a la indemnización por daños y al abono de intereses en caso de falta de cumplimiento. No obstante, en *Jack's Beach Resort, Inc. v. Cía. Turismo*, 112 D.P.R. 344, 349 (1982), señalamos que a pesar de ello:

... no siempre su fin es la liquidación anticipada de los daños. Tiene una función punitiva de violación del deber jurídico que da a la cláusula su otro nombre de "pena convencional" y que, rebasando el motivo de lucro en la obligación ordinaria, introduce un elemento de coerción y amenaza que apremia al deudor al cumplimiento.

Asimismo, en *R.C. Leasing Corp. v. Williams Int. Ltd.*, 103 D.P.R. 163, 169–170 (1974), indicamos que:

Respecto a las funciones de la cláusula penal nos hemos expresado antes, habiendo señalado que "las dos funciones más importantes atribuidas a la cláusula penal es [sic] la de asegurar el cumplimiento de una obligación ... y la de ... evaluar por anticipado los perjuicios que habría de ocasionar al acreedor el incumplimiento inadecuado de la obligación ...." *Simonet v. Igaravídez*, 90 D.P.R. 1, 9 (1964). Véanse: Puig Brutau, *Fundamentos de Derecho Civil*, to. 1, vol. 2, págs. 472–474; 3 Castán, *Derecho Civil Español, Común y Foral*, 8a. ed., 120–121.

Debido precisamente a que la cláusula penal no se encamina a reparar los daños sufridos por el acreedor sino que en adición cumple un fin coercitivo y punitivo, la referida cláusula permite, sujeto al principio de moderación de la pena, que las partes convengan que la evaluación de los daños "sobrepase la medida real del daño, de forma que este exceso actúe de modo eficaz como presión sobre el deudor para impulsarle al cumplimiento específico de la obligación ante la amenaza de tener que pagar un resarcimiento que exceda del equivalente pecuniario de la prestación a que se obliga." Espín [*La cláusula penal en las obligaciones contractuales*, 30 Rev. Der. Priv. 145, 153 (1946)]. Esta naturaleza *in terrorem* de la cláusula penal, en su función de fianza o garantía, tiene otro importante límite, sin embargo, que urge señalar. La prestación garantizadora puede ser tan desorbitada y excesiva que se convierta en una fianza impropia o caparra. 2 Santamaría, *Comentarios al Código Civil*, 90.

De lo anterior se desprende que no es un requisito indispensable el que una cláusula penal tenga un motivo de lucro, sino que ésta puede corresponder a una evaluación anticipada de los perjuicios que habría de ocasionar al acreedor el incumplimiento de la obligación principal.

Sobre el particular, nos señala C. Vidal Blanco, *El Leasing, una innovación en la técnica de la financiación*, Madrid, Ministerio de Hacienda, 1977, págs. 101–102, que:

> ... [E]n el propio contrato de Leasing se establece para el caso de impago de algunos (dos o tres) de estos plazos parciales, una *cláusula penal* consistente en facultar al arrendador para exigir del arrendatario el pago inmediato del resto pendiente del precio, quedando así anticipada la exigibilidad de los importes correspondientes a los plazos de la deuda contraída por el total arrendamiento contratado. (Énfasis suplido.)

De ahí que carezcan de validez los planteamientos de las arrendadoras, por lo que concluimos que la cláusula de aceleración —que es objeto de la controversia en el caso de autos— es de tipo penal. No obstante, no procede la modificación de tal cláusula. Veamos.

El Art. 1108 del Código Civil, 31 L.P.R.A. sec. 3133, dispone que:

> El tribunal o juez modificará equitativamente la pena cuando la obligación principal hubiera sido en parte o irregularmente cumplida por el deudor.

Sobre el particular, en *Jack's Beach Resort, Inc. v. Cía. Turismo*, supra, págs. 350–351, señalamos:

> La facultad judicial de moderación debe usarse sólo con gran cautela y notoria justificación. (S. de 13 junio, 1944). Al resultado de frenar el predominio absoluto de la autonomía de la voluntad, bien moderando los efectos de los contratos, ya limitando su obligatoriedad según normas de buena fe, ha de llegarse únicamente en circunstancias extraordinarias, como medio de templar su excesiva onerosidad para el obligado, o la desorbitada desproporción. Bonet Ramón, *Código Civil Comentado*, 2da. ed., 1964, a la pág. 959.
>
> La equidad representa para Pound una infusión de moral en el sistema legal, un recurso de alivio bajo circunstancias de extrema dureza; su concepto está ligado a la materia que la ley no define con precisión y deja a la discreción de un hombre bueno; a la corrección de deficiencias inevitables en la Ley por su universalidad, mas recuerda la advertencia de Blackstone de que no debe incurrirse en exceso de la libertad para ponde-

rar todo caso a la luz de la equidad porque se corre el riesgo de abolir la Ley y dejar la decisión de todo asunto al corazón del juzgador. Pound, *Jurisprudence*, T. 2, a la pág. 361 y ss.

Aplicando lo anterior al caso de autos, concluimos que no procedía la modificación de la cláusula penal de tal manera que ésta se eliminara totalmente. Ello puesto que, según indicáramos anteriormente, la cantidad reclamada por las arrendadoras pretende que éstas recuperen su inversión, toda vez que la entrega del bien, previa a la terminación del contrato, no cubre las costas y gastos incurridos por el arrendador. Nótese que el propio contrato provee para que se deduzca del importe total de lo adeudado la suma por la cual se venda el vehículo en cuestión, por lo que de por sí la cláusula ya ha sido atemperada a los fines de evitar una onerosidad excesiva hacia el arrendatario. De ahí que no nos encontremos ante una circunstancia extraordinaria que amerite una modificación de la cláusula en cuestión de tal manera que la elimine totalmente.

Ahora bien, según señaláramos en *R.C. Leasing Corp. v. Williams Int. Ltd.*, supra, pág. 172, "la moderación de la pena no debe llegar al punto de requerirle al acreedor que devuelva lo recibido en exceso al daño sufrido, 8 Manresa, *Código Civil Español*, 1967, pág. 574, pero en determinadas situaciones la pena puede reducirse a muy poco más de esa base".

A base de ello, no procede que se le reclame a los arrendatarios una suma en concepto del pago por adelantado del total de los cargos por servicios incluidos en el canon mensual de arrendamiento. Ello, puesto que los cargos por servicio o gastos de administración se refieren fundamentalmente a los gastos de estudios, documentación, informes y otros relacionados con el manejo de la cuenta del contrato de arrendamiento financiero. Véase Vidal Blanco, *op. cit.*, Cap. 2.1, pág. 212. Al terminar el contrato de *leasing* y finalizar sus efectos jurídicos, necesariamente conllevó la eliminación de los cargos por servicios de

administración. A partir de la entrega voluntaria de los bienes y su correspondiente aceptación, los arrendadores no incurrieron en gastos adicionales de administración o manejo de cuentas. Por ello, los arrendatarios no estaban obligados a satisfacer una suma por dicho concepto, ya que tales servicios no fueron prestados por los arrendadores financieros.

Por tal razón procede devolver los casos al foro de instancia para que determine qué cantidad corresponde a dicho concepto en cada uno de los casos, a los fines de que se deduzca tal cantidad del total que habrá de ser pagado por los arrendatarios.

En conclusión, *se revoca la sentencia recurrida y se devuelven los casos al foro de instancia para que continúen los procedimientos conforme a lo aquí resuelto.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton disintió con una opinión escrita, a la cual se unió el Juez Asociado Señor Negrón García. El Juez Asociado Señor Fuster Berlingeri no intervino.

— O —

Opinión disidente emitida por el Juez Asociado Señor Hernández Denton, a la cual se une el Juez Asociado Señor Negrón García.

Por entender que los contratos de arrendamiento financiero de vehículos de motor otorgados en los casos de autos son equiparables a ventas condicionales, disentimos. Al momento de otorgarse los contratos en los casos ante nos no existía legislación local sobre el arrendamiento financiero, por lo que procedía un análisis minucioso del contenido de los contratos para así determinar su naturaleza. El foro de instancia evaluó con cuidado los contratos y concluyó correctamente que eran análogos a unas ventas con-

dicionales y les extendió la prohibición contenida en el Art. 6(a) de la Ley de Ventas Condicionales, 10 L.P.R.A. ant. sec. 36. Por ende, sostuvo que las arrendadoras, a quienes se les había entregado los vehículos, no podían incoar una acción de cobro de dinero por el balance insoluto. Coincidimos con la extensa y bien fundamentada sentencia del tribunal a quo y la confirmaríamos.

I

Entre 1988 a 1990, los consumidores de los casos de autos otorgaron sendos contratos de arrendamiento financiero de vehículos de motor, por un término de sesenta (60) meses. Debido a problemas económicos, los consumidores entregaron a sus respectivas arrendadoras los vehículos que fueron objeto del contrato antes de cumplirse el término pactado originalmente. Aceptada la entrega voluntaria de los automóviles por parte de los consumidores, las arrendadoras reclamaron el balance de las cuentas, luego de haber vendido las unidades.

En el Caso Núm. CE-94-421 se reclamaba el cobro de once mil cincuenta y un dólares con veinticinco centavos ($11,051.25); en el Caso Núm. CE-94-423, seis mil seiscientos dieciséis dólares con sesenta y ocho centavos ($6,616.68); en el Caso Núm. CE-94-424, seis mil doscientos cincuenta y nueve dólares con veinticuatro centavos, ($6,259.24), y en el Caso Núm. CT-96-1, nueve mil ochocientos sesenta y nueve dólares ($9,869).

Los consumidores presentaron unas querellas contra las arrendadoras ante el Departamento de Asuntos del Consumidor (en adelante D.A.Co.) para cuestionar el cobro de las sumas indicadas, pues entendían que con haber entregado la unidad quedaban liberados de la obligación de pago. En todas las querellas, D.A.Co. determinó que el contrato de arrendamiento financiero estaba cubierto dentro de la definición de contrato de venta al por menor a plazos estable-

cida en la Ley de Ventas a Plazos y Compañías de Financiamiento, 10 L.P.R.A. sec. 731(6). De este modo aplicó el Art. 6(a) de la Ley de Ventas Condicionales, *supra*, el cual establece que el acreedor que opte por la reposesión del artículo que haya sido objeto del contrato renuncia a llevar una acción para el cobro de dinero contra el deudor. Concluyó que la entrega del vehículo por el arrendatario y la aceptación voluntaria por la arrendadora, le impedían instar una acción de cobro por la diferencia entre el balance de la cuenta y el precio de venta de la unidad.

Las arrendadoras de los Casos Núms. CE-94-421, 423 y 424 acudieron para solicitar de revisión ante el entonces Tribunal Superior de Puerto Rico, siendo referidos ante la Unidad Especial de Jueces de Apelaciones, Hon. Juez Germán J. Brau, donde los casos fueron consolidados. En el Caso Núm. CT-96-1, la arrendadora acudió ante el Tribunal de Primera Instancia mediante una Petición de Revisión, el cual a su vez solicitó y obtuvo la expedición de un auto de certificación por parte de este Tribunal, para consolidar este caso con los anteriores por plantearse la misma controversia de derecho.

El ilustrado tribunal de instancia confirmó la decisión de D.A.Co. y concluyó que los contratos de arrendamiento financiero que habían sido otorgados en los casos de autos eran análogos a las ventas condicionales y estaban sujetos a las disposiciones del Art. 6(a) de la Ley de Ventas Condicionales, *supra*. Afirmó que se trataban de contratos de adhesión y debían ser evaluados de la forma más favorable para la parte económicamente más débil: los consumidores. Por ende, las arrendadoras estaban impedidas de aceptar la entrega de los bienes y, simultáneamente, instar reclamaciones por el balance insoluto. Además, resolvió que en la alternativa de que se entendiera que el contrato era de arrendamiento financiero, D.A.Co. tenía discreción para moderar la cláusula penal de aceleración de los pagos,

por lo que procedía limitar la compensación de las arrendadoras al valor obtenido por la venta de los vehículos.

La opinión emitida por este Tribunal revoca esa decisión y concluye que el contrato de arrendamiento financiero no es equiparable al de venta condicional. Aunque reconoce que la Ley para Reglamentar los Contratos de Arrendamiento de Bienes Muebles, Ley Núm. 76 de 13 de agosto de 1994 (en adelante Ley Núm. 76), 10 L.P.R.A. sec. 2401 *et seq.*, no aplica al caso de autos, por ser posterior a la fecha de otorgamiento de los contratos, la decisión acoge la posición de las arrendadoras sin un análisis detallado de los contratos de autos.

## II

El contrato de arrendamiento financiero es un negocio atípico que no había sido objeto de regulación especial en Puerto Rico hasta 1994. Como para la fecha cuando se otorgaron los contratos que dan origen a la controversia de autos no existía legislación local especial sobre el contrato de *leasing*, aplicaba a éstos el principio de autonomía negocial consagrado en el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Véase *Meyers Bros. v. Gelco*, 114 D.P.R. 116 (1983). El hecho de que se trate de un negocio atípico no significa que los contratos de arrendamiento financiero estén exentos de toda la reglamentación protectora de los derechos de los consumidores. Concordamos con el tribunal de instancia cuando señala:

> ... No juzgamos ... que el carácter irregular del arrendamiento financiero deba funcionar como una coraza que aísle a dicho negocio contra la aplicación por analogía de *toda* otra disposición sustantiva de nuestro derecho patrimonial.
>
> .        .        .        .        .        .        .        .
>
> El carácter atípico del arrendamiento financiero significa que no debe presumirse de antemano la aplicabilidad de norma sustantiva alguna a dicha transacción, sino que hace falta un examen riguroso de los términos del negocio específico y de los

fundamentos y razón de ser de la norma cuya aplicación se pondera para determinar si ésta "provee la talla justa".[1]

Cabe señalar que precisamente porque antes de 1994 no estaba claro el estado de derecho sobre el arrendamiento financiero ni lo que podían hacer las arrendadoras en caso de incumplimiento por parte de los consumidores, fue que éstas recurrieron a la Asamblea Legislativa para solicitar que en caso de incumplimiento se les permitiera ejercer la doble acción de reposesión o entrega voluntaria y de cobro por el balance insoluto. El resultado fue la citada Ley Núm. 76, la cual permite la doble acción.

En ausencia de un ordenamiento aplicable específicamente a los contratos de arrendamiento financiero, en estricta juridicidad procedía una evaluación detallada de cada contrato para determinar su naturaleza. No olvidemos que es el *contenido* y no el *título* de los contratos lo que determina qué reglamentación les aplicará.

Antes de hacer este examen es necesario evaluar las figuras jurídicas con que se tienden a confundir los contratos de arrendamiento financiero. Primero evaluaremos la figura de las ventas condicionales y las ventas a plazos, para luego revisar la figura del arrendamiento financiero y así determinar la naturaleza jurídica real de los contratos ante nos.

## III

Una venta condicional es un negocio jurídico mediante el cual un comprador adviene en dueño de un bien con el riesgo de que su dominio se extinga si no cumple con la condición de pagar lo convenido. De esta manera ocurre una transferencia de dominio supeditada al cumplimiento de las condiciones del contrato. *Berríos v. Tito Zambrana*

---

[1] Sentencia del tribunal de instancia, Caso Civil Núm. KAC93-0679, págs. 19–20.

*Auto, Inc.,* 123 D.P.R. 317 (1989); *Arenas v. Batalla, y Francisco, Interventor,* 48 D.P.R. 31 (1935); *Montalvo v. Valdivieso,* 38 D.P.R. 545 (1928).

La venta condicional es un tipo de venta a plazos. *Berríos v. Tito Zambrana Auto, Inc.,* supra. En Puerto Rico esta figura está regulada por la Ley de Ventas a Plazos y Compañías de Financiamiento, Ley Núm. 68 de 19 de junio de 1964 (en adelante la Ley de Ventas a Plazos), 10 L.P.R.A. secs. 731 *et seq.* Originalmente esta ley incluía en la definición de contrato de venta al por menor a plazos, cierto tipo de arrendamiento. El Art. 101(6) de la Ley Núm. 68, *supra,* 10 L.P.R.A. sec. 731 (Sup. 1977), establecía en la definición de "contrato de venta al por menor a plazos":

> ... cualquier acuerdo convenido en Puerto Rico, incluyendo una hipoteca sobre bienes muebles, *contrato de venta condicional* o cualquier otro documento evidenciario de un acuerdo para pagar el precio de venta al por menor a plazos de mercancía o servicios en el transcurso de un período determinado de tiempo. También incluye cualquier *arrendamiento de mercancía mediante el cual el arrendatario convenga en pagar como compensación por el uso de la mercancía una suma sustancialmente equivalente a su valor, o en exceso de éste y por el cual se convenga que el arrendatario estará obligado a, o tiene la opción de, convertirse en dueño después de cumplir con los términos del contrato.*(²) (Énfasis suplido.)

Debido a estas disposiciones, se entendía que ciertos contratos de arrendamiento eran equiparables a ventas condicionales o a ventas a plazos.

Por su parte, el contrato de arrendamiento financiero es un negocio atípico que implica el arrendamiento de bienes en una relación tripartita. Por encargo del usuario, el arrendador adquiere los bienes que son objeto del negocio de un tercero (el vendedor) y procede a arrendarlos al usuario a la vez que le provee financiamiento. La cuota de

---

(²) Esta disposición es similar a la originalmente establecida en la Ley Uniforme de Ventas Condicionales federal. *Uniform Conditional Sales Act,* 1 *Uniformed Laws Annotated (U.L.A.)* Sec. 1.

alquiler incluye la amortización del costo del equipo, los intereses y demás cargas financieras y la utilidad o el beneficio del arrendador. Al término del contrato el arrendatario tiene tres (3) opciones: (1) devolver el bien; (2) realquilar el equipo de nuevo, o (3) adquirirlo. *Meyers Bros. v. Gelco*, supra, págs. 120–121. El arrendador retiene durante todo el período la titularidad de los bienes. El arrendatario, por su parte, asume los gastos y las responsabilidades asociadas al uso y mantenimiento del equipo. L. Rojo Ajuria, *"Leasing" Mobiliario*, Madrid, Ed. Tecnos, 1987, pág. 260.[3]

De acuerdo con la definición de "venta condicional y de arrendamiento financiero", la diferencia principal entre ambas figuras radica en la traslación del dominio. En las ventas condicionales, el dominio de los bienes se transfiere al comprador sujeto a que éste satisfaga el pago; por su parte, en el arrendamiento financiero, el arrendador retiene la titularidad de los bienes durante la duración del contrato.

Una diferencia adicional es que bajo la legislación local, los contratos de ventas condicionales gozan de una protección particular que consiste en que el vendedor, en caso de incumplimiento por parte del comprador, puede optar entre reposeer el bien objeto de la venta o presentar una acción de cobro de dinero. De optar por la reposesión, el vendedor renuncia a llevar la acción de cobro de dinero. 10 L.P.R.A. ant. sec. 36.

En 1987, la Ley de Ventas Condicionales fue enmendada mediante la Ley Núm. 92 de 2 de julio de 1987 (10 L.P.R.A. ants. secs. 31–41), para establecer que la entrega

---

[3] En los países civilistas, por su parte, la doctrina suele limitar la aplicación del contrato de arrendamiento financiero a transacciones dirigidas a la obtención del financiamiento de maquinaria dedicada a fines de negocios por entidades comerciales. C. Vidal Blanco, *El leasing, una innovación en la técnica de financiación*, Madrid, Ministerio de Hacienda, 1977, págs. 301–302; M. Gutiérrez Viguera, *El Leasing como Institución Financiera*, Madrid, Asociación para el Progreso de la Dirección, 1977, pág. 109; L. Rojo Ajuria, *"Leasing" Mobiliario*, Madrid, Ed. Tecnos, 1987, págs. 43–44.

voluntaria del bien equivalía a una reposesión. Esta enmienda respondió a la necesidad de proteger a los consumidores del enriquecimiento de las casas de financiamiento. La realidad era que los acreedores instaban a los compradores a entregar los artículos voluntariamente bajo la promesa de que no le dañarían su crédito. Posteriormente, los vendedores procedían contra los deudores para el cobro de dinero.[4] De esta manera se le concedió a la entrega voluntaria el mismo efecto que una reposesión, a los fines de que impedía ejercer la acción de cobro de dinero. Queda de manifiesto la existencia de una política pública clara en nuestra jurisdicción en torno a la protección de los consumidores contra la opresión de las casas de financiamiento.[5]

Cabe enfatizar que, por el hecho de que en Puerto Rico no existía una ley especial sobre el arrendamiento financiero hasta 1994,[6] prevalecía un estado de confusión, ya que la Ley de Ventas a Plazos hacía referencia a cierto tipo de arrendamientos. Esta situación propiciaba que muchos contratos que se redactaban con la creencia de que eran contratos de arrendamiento financiero, resultaban ser contratos de ventas condicionales al aplicarle lo establecido en

---

[4] Exposición de Motivos Ley Núm. 92 de 2 de julio de 1987, Leyes de Puerto Rico, pág. 394.

[5] Véanse los informes siguientes que son producto del Sub Comité de Asuntos del Consumidor creado por el ex Gobernador Luis A. Ferré en 1970: Informe Protección al Consumidor del Consejo Asesor del Gobernador para el Desarrollo de Programas Gubernamentales, pág. 19, recomendación Núm. 23 de 1970; Informe del *Consumer Protection Advisory Subcommittee of the Governor's Advisory Counsil*, pág. 41, recomendación Núm. 21 de 1970.

[6] Debemos indicar que en 1976 el Congreso de Estados Unidos aprobó el *Consumer Leasing Act*, Pub. L. Núm. 94-240, 90 Stat. 257, 15 U.S.C. secs. 1667 *et seq.* La ley *desplaza toda legislación estatal que resulte incompatible con sus disposiciones*, salvo que la junta de Directores del Sistema de Reserva Federal exima aquellos estatutos que resulten más favorables a los consumidores. 15 U.S.C. sec. 1667e. La Junta de Directores del Sistema de Reserva Federal adoptó en 1981 la *Regulation M* para la implantación de la ley, en la que se establece que estas disposiciones cubren a Puerto Rico. 12 C.F.R. sec. 213.1(a)(16).

la Ley de Ventas a Plazos.([7]) Por este motivo, en 1994 fue enmendada esta ley mediante la Ley Núm. 60 de 11 de agosto de 1994, para eliminar de la aplicabilidad de sus disposiciones el contrato de arrendamiento, ya que éste estaba siendo objeto de reglamentación especial en otro proyecto (Ley Núm. 76).

De la revisión antes realizada surge que para la fecha cuando se otorgaron los contratos del caso de autos —entre 1988–1990— existía confusión en torno a los contratos llamados de arrendamiento financiero, que eran en realidad ventas condicionales. El debate sobre cuándo se estaba ante alguna de estas figuras no era exclusivo de Puerto Rico, sino que existía y subsiste en otras jurisdicciones.([8]) En este contexto, se interpretaba que un arrendamiento era equiparable a una venta condicional si el arrendatario convenía en pagar por los bienes una suma sustancialmente equivalente a su valor o en exceso de éste y contaba con la opción de convertirse en su dueño al término del contrato.

---

([7]) Tanto en los países de tradición civilista como en la esfera federal ha existido el debate sobre bajo qué circunstancias puede un arrendamiento financiero considerarse una venta condicional. Véanse, en los países civilistas: Vidal Blanco, *op. cit.*, págs. 301–302; Gutiérrez Viguera, *op. cit.*, pág. 109; Rojo Ajuria, *op. cit.*, págs. 43–44. En la esfera federal, véanse: *Hervey et al. v. R.I. Locomotive Works*, 93 U.S. 664 (1876); (*Uniform Commercial Code*) 1B *Uniform Laws Annotated (U.L.A.)* Sec. 2A-101 *et seq.* (véase "Official Comment", pág. 662); 1 *Uniform Laws Annotated (U.L.A.)* Sec. 1-201(37) (véase "Official Comment", págs. 74–75).

([8]) En el caso particular de Estados Unidos se modificó la fórmula de la Ley Uniforme de Ventas Condicionales. La venta condicional se convirtió en un interés garantizado sujeto a los términos del Art. 9 del *Uniform Commercial Code*. 3A *Uniform Laws Annotated (U.L.A.)* Secs. 9-302 y 9-401. En 1987, el código fue enmendado de nuevo para adoptar el Art. 2A para reglamentar el arrendamiento financiero. Véanse: 1B *Uniform Laws Annotated (U.L.A.)* Sec. 2A-101 *et seq.* (véase "Official Comment", pág. 662). Los redactores del Art. 2A enmendaron extensamente la Sec. 1-201(37) del Código la cual define lo que es un interés garantizado (venta condicional). Bajo la versión original de la Sec. 1-201(37) del *Uniform Commercial Code* la *intención de las partes* era importante para determinar si se estaba ante un arrendamiento financiero o ante una interés garantizado (venta condicional). Luego de la enmienda lo determinante son *las realidades económicas del negocio* y no la intención de las partes, siendo fundamental evaluar si el arrendador retiene algún interés en los bienes. Véase 1 *Uniform Laws Annotated (U.L.A.)* Sec. 1-201(37) (véase "Official Comment", págs. 74–75).

## IV

Considerando esta normativa, procedamos a analizar el contenido de los contratos en controversia.

Según nuestra Ley de Ventas Plazos, previo a la enmienda de 1994, cuando el arrendatario conviene en pagar por los bienes una suma sustancialmente equivalente a su valor o en exceso de éste y cuenta con la opción de convertirse en su dueño al término del contrato, estamos ante una venta condicional.

En los cuatro (4) contratos ante nuestra consideración se pactó el arrendamiento de vehículos de motor por un término de sesenta (60) meses. En el Caso Núm. CE-94-423, el canon mensual ascendía a cuatroscientos doce dólares ($412) con un residual de tres mil quinientos dólares ($3,500). El pago total bajo el contrato era de veintiocho mil doscientos veinte dólares ($28,220), siendo su costo original de quince mil trescientos setenta y tres dólares ($15,373). En el Caso Núm. CE-94-424, el canon mensual era de trescientos doce dólares ($312) con un residual de dos mil doscientos ocho dólares ($2,208). El costo total del contrato era de veinte mil novecientos veintiocho dólares ($20,928), siendo el costo original del vehículo once mil quinientos veintinueve dólares ($11,529). En el Caso Núm. CT-96-1, la consumidora otorgó un pronto de cinco mil trescientos dólares ($5,300), el canon mensual ascendía a trescientos veintisiete dólares ($327) y tenía un residual de seis mil quinientos dólares ($6,500). El costo total del contrato totalizaba treinta y un mil cuatrocientos veinte dólares ($31,420), siendo el costo original del auto veintidós mil ochocientos setenta y ocho dólares ($22,878). En el Caso Núm. CE-94-421, el canon mensual consistía en cuatrocientos setenta y nueve dólares ($479) con un residual de cuatro mil quinientos siete dólares con veinte centavos ($4,507.20). El costo total del contrato ascendía a treinta y

tres mil doscientos cuarenta y siete dólares con veinte centavos ($33,247.20).(⁹)

En todos los contratos, los pagos que se realizarían hubieran ascendido a una suma en exceso del costo original de los vehículos. De esta manera se cumple con el primer requisito de la Ley de Ventas a Plazos.

Por otra parte, los contratos contenían cláusulas similares con respecto a las responsabilidades de los arrendatarios, tales como el pago de impuestos, patentes, seguros, asunción de pérdidas, gastos de inscripción, título y tablillas, reparaciones y mantenimiento. Se indicaba que al cumplirse el término del arrendamiento el vehículo debía ser entregado por el arrendatario para su venta. Si el producto de ésta excedía el valor residual fijado en el contrato, el arrendador tenía que pagar al arrendatario la diferencia, siempre que el arrendatario no hubiera incurrido en mora. Si el producto de la venta resultaba menor que el valor residual, el arrendatario se obligaba a satisfacer la diferencia al arrendador.

Somos del criterio de que estas cláusulas conforman el segundo requisito de las ventas condicionales en términos de que si bien los contratos no concedían una opción a los recurridos de convertirse en dueños de los vehículos, sí se había pactado la venta de los automóviles al término del contrato por su valor residual. No existía ninguna prohibición en los contratos que hubiera impedido a los consumidores adquirir los vehículos por el valor residual, en lugar de que se vendieran a terceros.

Por otra parte, los consumidores asumieron virtualmente todas las responsabilidades asociadas al dominio de los bienes, sin contar con la facultad de terminar el arren-

---

(⁹) No contamos con el costo original de esta unidad.

damiento antes de expirar el plazo.([10]) Concordamos con la sentencia del tribunal de instancia cuando concluye:

> Desde el punto de vista de las partes recurrentes, estos negocios conllevan la enajenación de los automóviles por un precio específico fijado desde el principio .... De existir algún sobrante de la venta ... en exceso del valor residual acordado, estas sumas son adjudicadas, conforme los términos de los contratos, a los arrendatarios. *Esta transferencia de equidad es característica de una compraventa, no de un verdadero lease.* (Citas omitidas y énfasis suplido.)([11])

Los contratos establecían a su vez que, en caso de incumplimiento con el pago de los cánones de arrendamiento, el arrendador tenía derecho a reposeer la unidad, debiendo el arrendatario pagar el balance de los cánones pactados durante todo el término del arrendamiento. Especificaban los contratos que la unidad sería utilizada para fines de negocios, comerciales o agrícolas, y no para fines personales, de familia o domésticos, y que el contrato no constituía un *lease* de consumidor según el *Consumer Leasing Act* de 1976 (15 U.S.C. sec. 1667 *et seq.*).

Al analizar estas cláusulas no podemos perder de vista que estamos ante *contratos de adhesión,* los cuales deben ser interpretados del modo más favorable a la parte económicamente más débil, que no tuvo nada que ver con su redacción. 31 L.P.R.A. sec. 3478. Los consumidores entendieron que con entregar la unidad se liberaban de la obligación. Las arrendadoras aceptaron sus vehículos y, luego de vender las unidades, les indicaron que debían pagar el remanente del costo del contrato. Los consumidores estaban sin vehículo y con la obligación de seguir pagándolos. *Nada nos parece más injusto.* Debemos recordar la política pública existente al momento de otorgarse los contratos de autos que protegía a los consumidores de cláusu-

---

([10]) Aún bajo el análisis del actual Art. 1-201(37) del *Uniform Commercial Code, supra,* y atendiendo las realidades económicas de los contratos, hay que destacar que las arrendadoras *no retuvieron interés alguno en los vehículos.*

([11]) Sentencia del tribunal de instancia, pág. 60.

las opresivas. Por otra parte, somos del criterio que los contratos están desconectados con las verdaderas circunstancias de los recurridos y que fueron diseñados con el propósito de escapar a la regulación federal.

Resulta necesario enfatizar que el hecho de que en 1994 las arrendadoras fueran a la Asamblea Legislativa y lograran que en la Ley Núm. 76 se les permitiera llevar las dos (2) acciones de reposesión y cobro, no debe incidir en el análisis del estado de derecho existente al momento de otorgarse los contratos de autos.(¹²) Hacer referencia a estas posturas tiene el efecto neto de aplicar de forma retroactiva la Ley Núm. 76, lo que constituye un grave error perjudicial a los consumidores.

Luego de revisar el contenido de los contratos ante nuestra consideración y el derecho aplicable al momento de su otorgamiento, concluimos que estos contratos son equiparables a los contratos de venta condicional, por lo que les aplica el Art. 6(a) de la Ley de Ventas Condicionales, *supra*, a los fines de que las arrendadoras, al haber aceptado la entrega voluntaria de los vehículos por parte de los consumidores, estaban impedidas de llevar una acción para el cobro de dinero por el balance insoluto.

Deseamos destacar la deseabilidad de que los consumidores conozcan la realidad jurídica de los contratos de arrendamiento financiero a la hora de suscribirlos. En la actualidad, la Ley Núm. 76 establece claramente los requisitos de los contratos de arrendamiento financiero y las penalidades que conlleva su incumplimiento.(¹³) El consu-

---

(¹²) Las posturas de la Asociación de Bancos de Puerto Rico y del Comisionado de Instituciones Financieras, a las que se hace referencia en la opinión de este Tribunal, son meramente *opiniones* que la Legislatura recibió y ponderó.

(¹³) Véase 10 L.P.R.A. secs. 2403–2404. Bajo el *Consumer Leasing Act*, el cual aplica a Puerto Rico, se requiere una divulgación total (*disclosure*) de todas las penalidades a las cuales se podría enfrentar el consumidor en caso de terminación temprana del contrato:

"b) Penalties or other charges for delinquency, default, *or early termination* may be specified in the lease *but only at an amount which is reasonable* in the light of the anticipated or actual harm caused by the delinquency, default, or early termination, the difficulties of proof of loss, and the inconvenience or nonfeasibility of

midor sabe con certeza a qué se enfrenta al otorgar un contrato de arrendamiento financiero, por lo que no tendría excusas cuando en caso de incumplimiento, además de la reposesión, se le exija el pago de la totalidad de los cánones hasta el vencimiento del contrato. Sin embargo, en la fecha cuando se otorgaron los contratos del caso de autos esa doble facultad de las arrendadoras no existía.

## V

Al concluir que los contratos del caso de autos son en realidad contratos de venta condicional, no es necesario entrar a dilucidar si la cláusula que establecía la reposesión y el cobro de dinero era una cláusula penal sujeta a modificación.

Por entender que no erró el Tribunal de Primera Instancia al determinar que los tres (3) contratos del caso de autos eran equiparables a contratos de venta condicional, hubiéramos confirmado la sentencia recurrida. En cuanto al contrato del caso que certificáramos, Caso Núm. CT-96-1, concluimos que éste es de venta condicional, por lo que confirmaríamos la resolución de D.A.Co. Por ende, como las arrendadoras aceptaron la entrega voluntaria de los vehículos, estaban impedidas de llevar la acción para el cobro de dinero por el balance insoluto, según establecido en la Ley de Ventas Condicionales. Al aplicar de forma retroactiva la Ley Núm. 76, *supra*, este Tribunal desampara a la parte más débil de esta relación: a los consumidores. Se valida así un abuso y se comete una gran injusticia.

Por los fundamentos antes esbozados, disentimos.

---

otherwise obtaining an adequate remedy." (Énfasis suplido.) 15 U.S.C. sec. 1667b(b). Véase 12 C.F.R. sec. 213.4(g) (1996).

En cuanto a si la Ley Núm. 76 de 13 de agosto de 1994 (10 L.P.R.A. sec. 2401 *et seq.*) de Puerto Rico contraviene lo establecido en la ley federal, *quaere.*