MEYERS BROS. PARKING SYSTEM OF PUERTO RICO, INC., demandante y peticionaria, *v.* GELCO PUERTO RICO, INC. ET AL., demandados y recurridos.

*Número:* O-82-314 *Resuelto:* 24 de marzo de 1983

*Ramón Mellado González*, de *Mellado, Mellado & Hernández*, abogado de la recurrente; *Dohanie Sepúlveda*, de *McConnell, Valdés, Kelly, Sifre, Griggs & Ruiz Suria*, abogada de los recurridos.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

Meyers Bros. Parking System of Puerto Rico, Inc. ("Meyers" o "la usuaria") celebró un contrato con Gelco Puerto Rico, Inc. ("Gelco" o "la arrendadora financiera") el 16 de noviembre de 1979. Por medio de este acuerdo Gelco se comprometió a comprar un automóvil nuevo, propiedad de Trébol Motors ("Trébol" o "la proveedora"), y cedérselo a Meyers por el término de treinta y seis meses a cambio de determinado canon. Meyers seleccionó el automóvil directamente en el establecimiento de Trébol, sin intervención de la financiera.

A partir del 17 de diciembre de 1979, la usuaria comenzó a acudir a Trébol, por instrucciones de Gelco, para que repararan la transmisión y otros desperfectos del vehículo. Tras esfuerzos alegadamente infructuosos de reparación, la usuaria demandó a Gelco. Meyers solicitó en su demanda la resolución de su contrato con la arrendadora financiera, más daños. Luego la usuaria enmendó su demanda para añadir como parte demandada a Trébol.

Gelco solicitó sentencia sumaria a su favor. Fundó principalmente su reclamación en que su contrato con la usuaria demandante la exoneraba de responsabilidad. La cláusula en cuestión provee:

(12) NO WARRANTY: LESSEE ACCEPTS DELIVERY OF EACH UNIT LEASED HEREUNDER FROM LESSOR, AS IS. LESSOR MAKES NO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHER WARRANTY WHATSOEVER, WHETHER EXPRESSED OR IMPLIED. Lessor shall permit Lessee to enforce in Lessee's own name any and all warranties made by the manufacturer of each Unit, but Lessor assumes no responsibility for compliance therefor by the manufacturer.

El Tribunal de Distrito desestimó la demanda contra Gelco. El Tribunal Superior confirmó la sentencia sumaria parcial dictada. La usuaria ha acudido en alzada ante nosotros. Sostiene primordialmente que la cláusula citada es contraria al interés público.

Nos enfrentamos por primera vez a la llamada o mal llamada institución del *leasing.* La institución tiene antiguas raíces, pero sus versiones modernas comienzan a desarrollarse en los años cincuenta en Estados Unidos y se difunden rápidamente a través del mundo. M. Gutiérrez Viguera, *El Leasing como Institución Financiera*, Madrid, Asociación para el Progreso de la Dirección, 1977, pág. 47 y ss.; C. Vidal Blanco, *El leasing, una innovación en la técnica de la financiación*, Madrid, Instituto de Estudios Fiscales, 1977, pág. 35 y ss.; S. L. Shapiro, *The ABC's of Leasing*, 1972 U. Ill. L.F. 433; M. Giovanoli, *Le Crédit-Bail (Leasing) en Europe: Développement et Nature Juridique*, París, Librairies Techniques (Litec), 1980, pág. 74 y ss. Examinemos rápidamente el ambiente económico en que se desenvuelve la institución para luego caracterizarla. Las realidades económicas a que responde arrojan luz sobre la función y validez de sus cláusulas.

El *leasing* es, en esencia, una nueva forma de financiamiento. Al terminar la Segunda Guerra Mundial las empresas industriales se vieron necesitadas de grandes sumas para permitir la transición a actividades de tiempos de paz y expansiones para satisfacer la extraordinaria demanda para viejos y nuevos productos. Los ingresos retenidos, las reservas generadas por las tasas de depreciación y la infusión de nuevo capital a través de emisiones de valores no bastaban. Las empresas descubrieron entonces que podía generarse nuevo capital a través de otros usos de sus propios activos. Podían venderse bienes de las corporaciones y sociedades, hasta fábricas enteras, y arrendarse en el mismo acto a ellas mismas. A través de esta técnica de la venta con pacto arrendaticio (*sale and lease back*) la

empresa liberaba capital para sus operaciones, a la par que, dentro del sistema tributario típico, podía deducir los cánones de arrendamiento que pagaba sobre sus antiguos bienes. De ahí a extender el concepto al uso de bienes que antes se adquirían fue solo un paso. En vez de comprar la propiedad deseada, la corporación solicita de un tercero —las futuras empresas de *leasing*— que la compre al proveedor y se la arriende bajo determinadas condiciones. S. J. Lee, *Introduction to Leasing*, Studio City, California, Coda Publications, 1965, pág. 3 y ss.; R. Illescas Ortiz, *El "leasing": aproximación a los problemas planteados por un nuevo contrato*, 1971 Rev. Der. Mercantil 73, 79; M. Sagrera Ribas y J. M. Martorell De Balanzó, *Hacia un mayor conocimiento del contrato de leasing (estudios monográficos)*, 71 Rev. Jur. de Cataluña 561 (1972).

■ El contrato entre el usuario y la entidad financiera asume diversas formas. Puede ser mobiliario o inmobiliario, financiero u operativo. En el arrendamiento operativo el propio fabricante o suplidor suele ser quien financia. En el arrendamiento financiero la relación es usualmente tripartita. El arrendador es un intermediario financiero entre el proveedor y el usuario. Esta opinión se referirá exclusivamente al arrendamiento financiero mobiliario.

■ La cuota de alquiler en el caso del arrendamiento financiero representa usualmente una forma de distinguir la figura. La cuota suele constar de tres componentes: la amortización del costo del equipo, los intereses y demás cargas financieras, y la utilidad o beneficio. El primer componente lleva a la fijación, por un período irrevocable, de una suma que cause generalmente la amortización total del bien a la conclusión del compromiso. El monto de los tres componentes puede fluctuar conforme el caso. M. Gutiérrez Viguera, *op. cit.*, pág. 80; D. Crémieux-Israël, *Leasing et Crédit-Bail Mobiliers*, París, Ed. Dalloz, 1975, págs. 30–31.

■ La entidad financiera es la propietaria del bien hasta el fin del arrendamiento. El usuario goza generalmente de una triple opción al expirar el término irrevocable: comprar el bien por su valor residual, normalmente fijado en el contrato; realquilar el equipo bajo nuevas bases, a la luz de su valor residual; o devolver la propiedad a la entidad financiera. Crémieux-Israël, *op. cit.*, pág. 31; J. M. De la Cuesta, *Reflexiones en Torno al "Leasing"*, 1970 Rev. Der. Mercantil 533, 594. En algunos países, al menos en ciertos casos provistos por ley, como en Francia, Bélgica y España la opción de la compra del bien es un elemento esencial del contrato, en otros, no. Giovanoli, *passim.*

■ Muchas de las dificultades surgidas en torno a esta institución se deben al empeño de algunos comentaristas de encajarla a la fuerza dentro del molde de otras figuras contractuales. El contrato de *leasing* —dentro de breve examinaremos la corrección de este término— posee elementos de otras figuras, pero se diferencia de ellas. No puede en verdad equipararse totalmente, como a veces se ha intentado, al arrendamiento puro, ni al arrendamiento-venta, ni al depósito, ni al préstamo, ni a la estipulación en favor de tercero, ni a otras figuras familiares afines, aunque a veces comparta características semejantes. Ninguno de estos vestidos provee la talla justa. Vidal Blanco, *op. cit.*, págs. 147–152. La opinión más generalizada al presente, la cual suscribimos, es que se trata de un contrato atípico, sui géneris, producto de la realidad cambiante del tráfico mercantil. F. Falletti, *La Vente a Crédit des Biens de Consommation*, París, Libraries Techniques (Litec), 1981, pág. 165. Según ha expresado el Tribunal Supremo de España en su S. de 10 de abril de 1981, núm. 1532, Aranzadi, XLVIII Repertorio de Jurisprudencia 1272, 1274:

> . . . el parecer más autorizado, y desde luego mayoritario, lo conceptúa de contrato complejo y atípico, gobernado por sus específicas estipulaciones y de contenido no uniforme. . . .

Al mismo efecto: J. Garrigues, *Curso de Derecho Mercantil*, 7ma ed., Madrid, 1979, Vol. II, pág. 98.

■ Su propia atipicidad ayudó a la propagación de la voz *leasing* para denominar este contrato en español, francés, italiano, alemán (*Leasingvertrag*) y otros idiomas. En el propio inglés, no obstante, el término *leasing* tiene una connotación mucho más amplia que la que se le quiso impartir en otros idiomas que importaron el vocablo. El tipo de contrato que nos ocupa se conoce usualmente en inglés como *finance lease*. Shapiro, *op. cit.*, pág. 435. Desde hace algunos años, se viene utilizando otra terminología en diferentes países. En España se ha generalizado el uso de la frase "arrendamiento financiero" para calificar este género de contrato. Véase el Real Decreto-Ley de 25 de febrero de 1977, núm. 28546, Aranzadi, XXII *Nuevo Diccionario de Legislación*, 1349–1350. En Italia (*locazione finanziaria*) y en Francia (*crédit-bail* o "crédito-arrendamiento") se emplean expresiones análogas. Utilizaremos el término español, con el entendido de que la referencia a arrendamiento, como apunta Garrigues, *loc. cit.*, no denota que la institución que nos ocupa se rige por las normas de tal figura.

En algunos países el arrendamiento financiero se regula, total o parcialmente, por legislación. Se le considera generalmente de orden mercantil. En España y Francia, por ejemplo, la reglamentación existente no se aplica a muchas clases de bienes, por lo que hay que acudir a los textos generales del Derecho común respectivo. El Tribunal Supremo de España ha expresado así la base jurídica del arrendamiento financiero no reglamentado:

> Carente tal contrato en nuestro ordenamiento positivo de regulación en el campo del derecho privado, claro está que su otorgamiento es posible en lícito ejercicio del principio de autonomía negocial y de libertad en la regulación del pacto proclamado en el art. 1255 del C. Civ., que faculta a los sujetos para superar, a impulsos de las incesantes exigencias del

tráfico económico, el elenco de esquemas o pautas contractuales previstas por el legislador, necesariamente limitadas, sin que ello comporte menoscabo de categoría dogmática alguna. ... S. de 10 de abril de 1981, *supra*, pág. 1274.

■ El contrato de arrendamiento financiero no es objeto de regulación especial alguna en Puerto Rico. Se rige, en consecuencia, por el principio de la autonomía negocial, consagrado en el Art. 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372, equivalente al 1255 del Código Civil español. [1] Pasemos ahora a examinar si la cláusula de exoneración pactada en este caso es o no contraria al orden público. La cuestión ha sido objeto de examen en otras jurisdicciones.

■ Lo primero a observar es que en este género de transacciones la inserción de ciertas cláusulas de exoneración de la entidad financiera es un elemento típico del contrato en multitud de países. La razón es fácil de discernir. El negocio básico de tal entidad es proveer financiación. La compra del equipo y su arrendamiento a un tercero son operaciones subsidiarias. En Estados Unidos, las cláusulas para librar a la financiera de toda responsabilidad derivable de su condición de propietaria y arrendadora del bien, son parte acostumbrada del contrato. Lee, *op. cit.*, págs. 57-58. Se le traspasa normalmente al usuario todo riesgo, excepto los referentes a la financiación. Lee, *op. cit.*, pág. 105; Shapiro, *op. cit.*, pág. 435.

■ En España es también usual exonerar a la financiera de toda responsabilidad relativa al mal funcionamiento de la cosa, mas se subroga al usuario en los derechos de la financiera en cuanto a las acciones que le correspondan como compradora frente al vendedor. Vidal Blanco, *op.*

---

[1] El Art. 1207 dispone:

"Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público."

*cit.*, pág. 118; Gutiérrez Viguera, *op. cit.*, pág. 265. En su S. de 10 abril de 1981, *supra*, pág. 1274, el Tribunal Supremo de España ha expresado:

> Mientras que en el "leasing operativo" la entidad arrendadora afronta el riesgo técnico, prestando los servicios de mantenimiento y asistencia, por el contrario en el "leasing financiero" todos los gastos ocasionados por las reparaciones, mantenimiento, servicios técnicos, conservación, seguros, etc., del bien financiado, corren de cuenta del usuario, a quien incluso pueden alcanzar si así se pacta, todos los riesgos, desde el relativo a la idoneidad del material para la explotación, funcionamiento y resultado (por subrogación convencional del usuario para el ejercicio de las acciones de saneamiento frente al vendedor), hasta el de pérdida por caso fortuito. . . .

En Francia, la Corte de Casación ha resuelto que la financiera puede exonerarse válidamente de toda responsabilidad en caso de que el bien mueble resulte impropio para el uso previsto, a condición de que no haya intervenido en la selección de la cosa y que le haya transferido al usuario las garantías correspondientes a su condición de compradora. Cass. com. de 7 de mayo de 1974 y Cass. civ. 1 de febrero de 1978; Dalloz, *Encyclopédie Juridique, Crédit-Bail*, párrs. 37–38, 41–42, *Leasing* (Supl. 1982), párr. 28. La exoneración de la financiera puede cubrir legítimamente, sujeto a las condiciones mencionadas, la responsabilidad por vicios ocultos. Giovanoli, *op. cit.*, págs. 238–239; Crémieux-Israël, *op. cit.*, págs. 57–58.

En Alemania Occidental también se reconoce hoy la validez de las cláusulas de exoneración, siempre que la financiera le transfiera al usuario sus derechos contra el suplidor. Giovanoli, *op. cit.*, pág. 280. A soluciones comparables se llega en Bélgica, Italia y Suiza. *Ibíd.*, págs. 306, 321, 335.

En el caso de autos, las partes pactaron que la financiera no asumía responsabilidad por riesgo alguno. La

financiera, además, se comprometió expresa o implícitamente a permitirle al usuario valerse de todas las garantías que le correspondiesen frente al fabricante y al proveedor. La función de Gelco respecto al bien fue la de facilitar el financiamiento de la transacción. En tales circunstancias resolvemos que la cláusula en controversia es válida bajo las disposiciones del Art. 1207 de nuestro Código Civil. Es sostenible, en consecuencia, la sentencia sumaria dictada en cuanto resuelve que la cláusula impugnada no es contraria al interés público.

 La referida sentencia, sin embargo, no tiene otro alcance. No se interpretará en modo alguno como determinación de ningún género sobre otros aspectos del arrendamiento financiero. Se advertirá que esta nueva figura comprende, en situaciones como la actual, aunque no siempre, dos contratos: el celebrado entre la financiera y el proveedor y el otorgado entre aquélla y el usuario. Los procedimientos en instancia continuarán para determinar si existen las condiciones para la rescisión por el usuario, vía la subrogación pactada, del contrato entre el proveedor y la financiera y si procede el resarcimiento por daños. A estos últimos efectos se podrá tomar en cuenta no sólo lo dispuesto en el Art. 1375, sino también en el Art. 1077 del Código Civil, 31 L.P.R.A. secs. 3843 y 3052. También deberá ventilarse la cuestión del efecto de tal rescisión, de así decretarse, sobre el contrato entre la financiera y el usuario. Sobre este último particular, se ha resuelto en Francia, por ejemplo, que la rescición del contrato entre el proveedor y la financiera provoca el desplome del contrato entre ésta y el usuario, por defecto de causa, aunque el segundo contrato no puede rescindirse sin actuar contra el primero. Com. 4 de febrero de 1980, 1er esp., D. 1980, Inf. rap. 565, obs. Larroumet; D. 1981, Inf. rap. 20, obs. Vasseur (Fr.). Respecto a los alquileres, véase: Dalloz, *op. cit., Leasing* (Supl. 1982), párr. 26. No es aconsejable pronunciarnos sobre este importante aspecto del arrendamiento financiero

sin el beneficio de un récord completo ni la debida argumentación de las partes en instancia.

Así aclarada, *se confirmará la sentencia sumaria parcial dictada.*