El Juez Asociado Señor Feliberti Cintrón
emitió la opinión del Tribunal.
En el presente recurso tenemos la oportunidad de acla-rar y profundizar sobre una controversia novel que surge en los parámetros de la institución legal del contrato de arrendamiento financiero, comúnmente conocido como leasing. En particular, debemos resolver si en caso del in-cumplimiento de un contrato de arrendamiento financiero, la entrega del bien objeto del contrato debido a desperfec-tos mecánicos —de los cuales el arrendador ha quedado totalmente relevado, y que además se han transferido al arrendatario todas las garantías que el arrendador tuviese con el suplidor, respecto al funcionamiento adecuado del vehículo— compensa adecuadamente al arrendador de su riesgo e inversión con relación a la responsabilidad del arrendatario por el incumplimiento o resolución unilateral del contrato.
*545 I
En octubre de 2000, José A. Andréu Fuentes (señor An-dréu o el recurrido) decidió adquirir un vehículo para su uso personal, marca Audi, modelo A6 del 1998, que vendía el proveedor de automóviles JP Motors, Inc. (JP Motors). El señor Andréu optó por financiar el vehículo a través de un arrendamiento financiero abierto otorgado con Popular Leasing (en ocasiones identificado como Popular Auto). El 17 de octubre de 2000, Popular Leasing compró el vehículo seleccionado por el señor Andréu de JP Motors en cuarenta mil dólares ($40,000),(1) y se lo arrendó el mismo día al recurrido. De acuerdo con el contrato de arrendamiento, el señor Andréu pagó un pronto de cinco mil dólares ($5,000) a Popular Leasing y se obligó a pagar una mensualidad de seiscientos noventa y ocho dólares ($698) durante sesenta meses, con la opción de comprar el vehículo por el precio de nueve mil novecientos dólares ($9,900) al cumplirse el tér-mino del contrato.
Mediante el lease, Popular Leasing le transfirió al señor Andréu todas las garantías provistas por el vendedor, ad-virtiendo que si el vehículo no le era satisfactorio, debía “presenta [r] su reclamación únicamente contra el suplidor u otra persona y no contra [Popular Leasing]”.(2) Por su parte, el señor Andréu se obligó a no cancelar o revocar el arrendamiento “en momento alguno por razón alguna” y a pagar todos los cánones de arrendamiento incondicional-mente “aún si el vehículo le es robado, dañado o destruido, si tiene defectos, o si ... ya no [se] puede utiliza[r]”.(3)
Asimismo, el recurrido confirió varias garantías a favor *546 del arrendador. En el anejo al contrato titulado “Recibo de entrega y aceptación y certificación del arrendatario”, el recurrido certificó que la unidad fue recibida de forma sa-tisfactoria, en buenas condiciones, que no adolecía de de-fecto alguno, que estaba operando satisfactoriamente y que aceptaba la unidad de forma irrevocable. Reiteró, además, que no podía cancelar el contrato por ningún motivo y que aceptaba que el financiador no respondería por defectos, garantías, servicio o fallos de la unidad.
También se suscribieron dos relevos de responsabilidad como parte de los negocios. Ambos relevos —uno otorgado por el señor Andréu para el beneficio de Popular Auto, y el segundo suscrito por JP Motors a favor del arrendador y arrendatario— garantizaban el título del vehículo y que estaba libre de toda carga o gravamen, a la vez que acor-daron defender e indemnizar toda reclamación que sur-giera con relación a esas garantías.
En febrero de 2002, el señor Andréu empezó a confron-tar graves problemas con su vehículo, el cual aún estaba bajo garantía.(4) El sistema electrónico del interior del ve-hículo, incluyendo los “power windows”, “power locks”, “sunroof” y la computadora le fallaban al extremo de con-vertir el vehículo en inservible. El 5 de febrero de 2002, el señor Andréu llevó el vehículo al representante autorizado y agente de servicios de garantía de Audi en Puerto Rico, Gómez Hermanos Kennedy, Inc. (Gómez Hermanos) para que fuese reparado. Durante esta primera visita, el vehí-culo permaneció en Gómez Hermanos hasta el 8 de febrero de 2002, para un total de cuatro días. En el mismo mes, los problemas se volvieron a manifestar. El señor Andréu re-gresó a Gómez Hermanos el 26 de febrero de 2002, donde su vehículo se quedó hasta el 8 de marzo de 2002, para un *547 total de once días. Debido a que los desperfectos continua-ban presentándose, el recurrido no tuvo otro remedio que regresar nuevamente a Gómez Hermanos por tercera vez el 18 de abril de 2002. Luego de transcurridos otros dieci-nueve días con el vehículo en el taller mecánico, el señor Andréu pasó a recoger el vehículo el 6 de mayo de 2002, cuando le informaron que todavía no estaba listo.
El 14 de mayo de 2002, mientras el vehículo permanecía aún en Gómez Hermanos en el cuarto intento de atender los defectos, el señor Andréu envió una carta vía facsímil a Gómez Hermanos, para informar todo lo sucedido hasta entonces con respecto a su vehículo y concederle una úl-tima oportunidad de cinco días para finalizar su reparación. Advirtió que de lo contrario, debían sustituir el vehículo por uno de igual calidad y precio. El señor Andréu nunca recibió una contestación a su reclamo y el vehículo continuó fuera de servicio y en manos de Gómez Hermanos hasta el 19 de julio de 2002. Esta cuarta visita duró se-tenta y cinco días.
El 26 de junio de 2002, antes de ser notificado que el vehículo estaba arreglado, el señor Andréu cursó cartas certificadas con acuse a Gómez Hermanos, JP Motors y Popular Leasing comunicando sus intenciones en cuanto al vehículo. Para ese momento, habían transcurrido un total de ochenta y seis días durante los cuales el señor Andréu, como usuario del vehículo, estuvo privado de su uso desde su primera visita a Gómez Hermanos. El señor Andréu les informó a Gómez Hermanos y a JP Motors que por razón de los vicios ocultos del vehículo, “resolvfía] el contrato de compraventa del vehículo y el de arrendamiento financiero suscrito con Popular Leasing”. Les reclamó “la devolución del precio total pagado por el vehículo, los gastos incurri-dos, así como los daños y perjuicios causados”.(5) En la carta dirigida a Gómez Hermanos añadió que “en relación al vehículo en cuestión en lo sucesivo se comuniquen con *548 Popular Leasing and Rental, Inc., a quienes como titulares del vehículo se le ha hecho entrega del mismo en sus facilidades”.
En su carta a Popular Leasing, el señor Andréu repitió que resolvía el contrato de arrendamiento suscrito con ellos y que daba el vehículo por entregado en las instala-ciones de Gómez Hermanos. Concluyó la carta con el men-saje siguiente:
Debe quedar meridianamente claro que desde este momento el suscribiente no realizará pago adicional alguno a su compa-ñía por concepto del arrendamiento del vehículo, advirtién-dose que de afectárseme en el futuro el crédito por esta situa-ción constituirá una causa de acción por los daños y perjuicios que ello pueda causarme. Apéndice, pág. 72.
Conforme con lo anterior, Popular Auto recuperó el ve-hículo en Gómez Hermanos el 8 de agosto de 2002.(6)
El 13 de agosto de 2002, Popular Auto le notificó por escrito al señor Andréu que adeudaba un balance de arren-damiento ascendente a treinta y dos mil novecientos once dólares con cuarenta y nueve centavos ($32,911.49) para obtener ofertas de compra o arrendamiento del vehículo sin éxito alguno. Por lo tanto, se le concedía el término adicional provisto en el lease para que consiguiera un com-prador o pagara lo adeudado. Ante el silencio del señor Andréu, Popular Auto procedió a vender el vehículo en su-basta pública el 26 de septiembre de 2002 por dieciséis mil quinientos dólares ($16,500). El 17 de octubre de 2002, Popular Auto le notificó al señor Andréu de la venta e informó que el balance de la deuda quedaba en dieciséis mil cua-trocientos once dólares con cuarenta y nueve centavos ($16,411.49).
El nuevo dueño del Audi confrontó los mismos defectos que afectaron al señor Andréu y, consecuentemente, lo *549 llevó en dos ocasiones adicionales a Gómez Hermanos. Des-pués de más de un mes en el taller, el vehículo finalmente fue reparado de manera definitiva en noviembre de 2002.
El litigio que ahora nos ocupa comenzó el 1 de julio de 2002, fecha cuando el recurrido presentó su demanda en el Tribunal de Primera Instancia (TPI) en el que solicitó la rescisión del contrato de compraventa y de arrendamiento financiero del vehículo, incluyendo como demandados a Popular Leasing, JP Motors y Gómez Hermanos.(7) La de-manda planteó que, por razón de los vicios ocultos del ve-hículo, JP Motors y Gómez Hermanos le respondían solidariamente al señor Andréu por el precio pagado por el vehículo, además de gastos e intereses. Reclamó, en la al-ternativa, que le pagaran esa cantidad directamente a Popular Leasing después de compensar a los demandantes sus gastos y desembolsos. Solicitó, además, que JP Motors y Gómez Hermanos le compensaran los daños y peijuicios sufridos por él a consecuencia de los vicios del vehículo, estimados en una cantidad ascendente a cincuenta mil dó-lares ($50,000). También solicitó al TPI que ordenara a Popular Leasing que se abstuviera de cobrarle los cánones de arrendamiento pendientes y le compensara por sus daños. Gómez Hermanos y Popular Leasing contestaron la de-manda, mientras que JP Motors, a pesar de haber solici-tado una prórroga para responder, nunca sometió una alegación.
Popular Leasing presentó una reconvención argumen-tando que los hechos exponían la violación del lease por parte del señor Andréu al resolver el contrato unilateral-mente y, por lo tanto, el recurrido era responsable del balance adeudado de dieciséis mil cuatrocientos once dólares con cuarenta y nueve centavos ($16,411.49). Adujo, ade-más, que Popular Leasing no respondía por la condición *550 defectuosa del vehículo ya que, conforme al contrato, era inmune a toda reclamación por vicios, incumplimiento de garantías o daños que resultaran como consecuencia de estos.(8)
Por no existir hechos controvertidos, el TPI decidió resolver el caso por la vía sumaria. El señor Andréu argu-mentó que JP Motors y Gómez Hermanos respondían por el precio del vehículo, apoyándose en la Ley Complementa-ria de Garantías de Vehículos de Motor (Ley Complemen-taria de Garantías),(9) ahora derogada,(10) la cual obligaba a un vendedor a comprar nuevamente o reemplazar un ve-hículo de motor que no se ajustaba a la garantía de estar presentes los criterios allí establecidos o, en la alternativa, conforme a la doctrina de saneamiento por vicios ocultos.(11) Gómez Hermanos y Popular Auto se opusieron a esa moción y solicitaron que en su lugar se emitiera sen-tencia sumaria a su favor. Popular Auto, por su parte, adujo que la reclamación en su contra no procedía porque, aunque un arrendatario típicamente puede subrogarse en el lugar del arrendador y reclamar la garantía directa-mente del proveedor, esto a base de la Ley para Regular los Contratos de Arrendamientos de Bienes Muebles (Ley para Regular los Contratos de Arrendamientos),(12) en este caso era imposible rescindir el contrato de compraventa puesto que el vehículo para ese entonces estaba en manos de un tercero, lo que impedía restituir las contraprestaciones.
El 23 de febrero de 2006, el TPI dictó una sentencia sumaria a favor del señor Andréu, concediéndole, además, gastos y honorarios de abogado. El TPI determinó, como *551 parte de los hechos no controvertidos, que el vendedor-distribuidor del vehículo lo fue JP Motors; que éste era responsable de honrar las garantías del fabricante; que Gó-mez Hermanos era el representante autorizado y agente de garantía del manufacturero (Audi) en Puerto Rico, y que el vehículo presentaba vicios.
Concluyó que no procedían las reclamaciones del recu-rrido contra ningún demandado al amparo de la Ley Com-plementaria de Garantías ni según la teoría de sanea-miento por vicios ocultos, por éste no tener legitimación activa, ya que no era el dueño del vehículo, y por ya no existir el bien para que el vendedor lo comprara. (13) Sin embargo, el TPI encontró que, a base del relevo de respon-sabilidad suscrito por JP Motors, éste le respondía a Popular Auto por el balance adeudado del arrendamiento en lugar del señor Andréu, y también estaba obligado a in-demnizar al señor Andréu por los ochenta y seis días que estuvo privado del uso de su vehículo, además de las cos-tas, los gastos y los honorarios de abogado.
Mediante su Moción de Reconsideración y Segunda Mo-ción de Sentencia Sumaria, Popular Auto planteó que la sentencia sumaria no dispuso de la totalidad del caso al no expresarse sobre su Reconvención y que el remedio resul-taba ser trunco, ya que JP Motors era insolvente y había cerrado sus operaciones en Puerto Rico.(14) Argüyó, ade-más, que, no obstante el relevo de JP Motors, el señor An-dréu continuaba directamente obligado a pagar la deuda entera del lease al financiador conforme al contrato de arrendamiento.
El TPI acogió esa reconsideración y modificó su deter-minación original. En su Sentencia Sumaria Enmendada, *552 dictada el 10 de mayo de 2007, declaró “ha lugar” la recon-vención de Popular Auto y ordenó al señor Andréu pagarle a Popular Auto el dinero adeudado en calidad de arrenda-miento financiero del vehículo, más honorarios de abogado razonables. Por otro lado mantuvo, a base del relevo de JP Motors, que éste indemnizara al señor Andréu por la defi-ciencia pendiente del arrendamiento, más los días que se encontró sin el uso de su vehículo debido a los vicios.
Inconforme, el señor Andréu recurrió al Tribunal de Apelaciones. Examinados los alegatos de Popular Auto, Gómez Hermanos y JP Motors, el foro apelativo intermedio reinstaló la Sentencia Sumaria originalmente emitida por el TPI. El Tribunal de Apelaciones decretó que el señor Andréu había cumplido con sus obligaciones contractuales. Entendió, además, que al vender el vehículo en subasta, en lugar de procurar la rescisión de la compraventa del vehí-culo del proveedor (JP Motors) conforme la Ley Comple-mentaria de Garantías, Popular Auto se autoinfligió sus daños y no podía cobrarle al señor Andréu lo que éste adeu-daba como arrendatario.
Popular Leasing acudió ante nos oportunamente, me-diante un recurso de certiorari, señalando los cuatro erro-res siguientes:

Primer error:

El Tribunal de Apelaciones [erró] al resolver que el hecho de que el apelante entregara voluntariamente la unidad y dejara de hacer los pagos a que se obligó en el contrato, no constituye incumplimiento del contrato de leasing. La sentencia del [Tribunal de Apelaciones] injustificadamente desechó las obli-gaciones contractuales entre las partes y no tomó en conside-ración el relevo otorgado por el apelante relevando al financia-dor por los defectos que pudiera tener la unidad y obligándose a pagar el fínanciamiento sin importar que la unidad tuviera defectos.

Segundo error:

Erró el [Tribunal de Apelaciones] al resolver que Popular Auto tenía la obligación de instar una acción para obligar al *553 proveedor!,] manufacturero o distribuidor a relevar al deudor del contrato de financiamiento.

Tercer error:

Erró el [Tribunal de Apelaciones] al aceptar la teoría de que Popular Auto se autoinfligió sus daños especialmente cuando dicha teoría fue traída por primera vez en apelación y nunca fue alegada antes de la apelación.

Cuarto error:

Erró el [Tribunal de Apelaciones] al reinstalar la primera sen-tencia dictada por el TPI cuando la misma no dispone de forma alguna de la Reconvención de Popular, por lo que enton-ces dicha alegación continúa vigente y no se ha dictado un remedio completo. El Tribunal de Apelaciones tampoco tomó en consideración de que el proveedor de la [u]nidad [JP] Motors cerró operaciones y Popular Auto no puede recuperar nada de dicha parte. Recurso de certiorari, págs. 4 — 5.
Evaluado el recurso, acordamos expedir. Tras analizar todos los escritos ante nuestra consideración, así como el derecho aplicable, procedemos a resolver las controversias presentadas, enfocándonos principalmente en el segundo error señalado.
II
A. Contrato de “leasing”
 El contrato de arrendamiento financiero o leasing “es un negocio jurídico cuyo contenido está formado por varias declaraciones de voluntad, las cuales producen una relación jurídica [entre las partes suscribientes] y estable-cen los términos que la regulan”. CNA Casualty of P.R. v. Torres Díaz, 141 D.P.R. 27, 33 (1996). El arrendamiento financiero se destaca por ser el producto de una relación tripartita la cual se organiza a través de dos negocios separados. El arrendador sirve como intermediario finan-ciero entre el proveedor (vendedor o suplidor) y el arrenda-tario (usuario). Meyers Bros. v. Gelco, 114 D.P.R. 116, 120 (1983). Típicamente, después de que el arrendatario escoja el bien que quiere usar y llega a un acuerdo con el arren- *554 dador para que se otorgue un lease, éste compra el bien del proveedor y se lo arrenda a aquél por un término fijo irrevocable. Class v. Vehicle Eqmnt. Leasing Co., 143 D.P.R. 186, 197 (1997). No obstante esa realidad comercial, el contrato de arrendamiento financiero consagra las obli-gaciones y los derechos entre el arrendador y arrendatario. Véanse: CNA Casualty of P.R. v. Torres Díaz, supra, págs. 33-34; Class v. Vehicle Eqmnt. Leasing Co., supra, pág. 197.
A través de nuestra jurisprudencia, hemos identificado la institución del arrendamiento financiero como una relativamente nueva forma de financiamiento, “un contrato atípico, sui géneris, producto de la realidad cambiante del tráfico mercantil”. Class v. Vehicle Eqmnt. Leasing Co., supra, pág. 198 (citando Meyers Bros. v. Gelco, supra, pág. 121). Antes de aprobarse la Ley para Regular los Contratos de Arrendamientos, el lease se regía por el principio de la autonomía contractual consagrado por el Art. 1207 de nuestro Código Civil, 31 L.P.R.A. sec. 3372. Class v. Vehicle Eqmnt. Leasing Co., supra, pág. 198 (citando Meyers Bros. v. Gelco, supra, pág. 123). Es menester notar que uno de los objetivos de la Ley para Regular los Contratos de Arrendamientos fue estimular la celebración de estos contratos para lograr un crecimiento económico, lo cual denota la importancia e impacto que este tipo de negocio ha tenido en la sociedad y en el desarrollo mercantil puertorriqueño. Art. 2 de la Ley Núm. 76-1994, supra.
Es característica irmata del lease que el financiador retiene el título sobre la unidad arrendada a lo largo del arrendamiento financiero, mientras que el arrendatario goza de su posesión y uso, siempre y cuando no incumpla con las cláusulas del contrato. 10 L.P.R.A. sec. 2408; CNA Casualty of P.R. v. Torres Díaz, supra, págs. 33—34; Nieves Vélez v. Bansander Leasing Corp., 136 D.P.R. 827, 838 (1994); Meyers Bros. v. Gelco, supra, pág. 121. Es solo al vencerse el término del contrato que el usuario tiene una *555 triple opción de comprar el bien por el valor residual pac-tado en el lease, realquilarlo mediante un nuevo contrato o devolverlo al arrendador. 10 L.P.R.A. sec. 2417; Meyers Bros. v. Gelco, supra, pág. 121. También cabe señalar que la cuota de alquiler pactada en el arrendamiento finan-ciero suele consistir de “tres componentes: la amortización del costo del equipo, los intereses y demás cargas financie-ras, y la utilidad o beneficio” del uso del bien arrendado. Meyers Bros. v. Gelco, supra, pág. 120. “El primer compo-nente lleva a la fijación, por un período irrevocable, de una suma que cause generalmente la amortización total del bien a la conclusión del compromiso.” (Énfasis suplido.) íd.
Claro está, aparte de la información requerida en todo contrato de arrendamiento mediante la Ley para Regular los Contratos de Arrendamientos, los términos y las condiciones del arrendamiento financiero varían de lease en lease. 10 L.P.R.A. sec. 2403. En el caso Meyers Bros. v. Gelco, supra, tuvimos la primera oportunidad de pronunciarnos en torno a este modo emergente de contratar. Ahí resolvimos que una cláusula que exonere al arrendador de toda responsabilidad por la garantía del vehículo es válida, ya que no es contraria al interés público. íd., pág. 125. Deducimos que ese tipo de cláusula, la cual traspasa al usuario todo riesgo excepto la financiación del bien, se fundamenta en que el negocio básico del arrendador es pro-veer financiación, mientras que son funciones subsidiarias las de comprar y arrendar la unidad. íd., pág. 123.
Expandiendo sobre esa noción, en CNA Casualty of P.R. v. Torres Díaz, supra, pág. 34, notamos que “[p]or lo general, los contratos de arrendamiento financiero contienen ciertas garantías destinadas a proteger al arrendador [o más bien, su interés económico] de sucesos inadvertidos que puedan producirse durante la duración del contrato”, tal como, por ejemplo, requerir al usuario suscribir una póliza de seguro. Cuando un arrendatario se compromete a asumir todos los riesgos e indemnizar al arrendador por los *556 daños o la destrucción de la unidad arrendada, su obliga-ción de pagar la totalidad de los cánones mensuales esta-blecidos en el contrato no desaparece, sin importar la con-dición en que se encuentra el bien durante la vigencia del arrendamiento. Id., pág. 35. Por cierto, el arrendamiento financiero está diseñado con la finalidad de recuperar la inversión total del arrendador e “impedir que la pérdida de la unidad arrendada se convierta en una pérdida finan-ciera para el arrendador”. Id., pág. 36.
Partiendo de este marco normativo, procedemos al aná-lisis que nos ocupa.
B. Incumplimiento del “lease”por el arrendatario
Popular Auto alega que el tribunal apelativo intermedio erró al resolver que el señor Andréu cumplió con el con-trato de arrendamiento financiero, toda vez que el recu-rrido, como arrendatario, entregó voluntariamente el vehí-culo al arrendador antes de que se cumpliera con el término fijo del lease y dejó de hacer los pagos mensuales a causa de los desperfectos que sufrió el vehículo durante varios meses.(15) Para determinar si se cometió el error se-ñalado, es necesario examinar las cláusulas del contrato de arrendamiento otorgado en el caso de autos. Conforme al lease, Popular Auto acordó comprar el vehículo seleccio-nado por el señor Andréu para propósitos de arrendárselo bajo ciertos términos y condiciones impresas en “letra pequeña”. Las “Condiciones Importantes” destacadas en la Cláusula 7 del contrato, en lo pertinente, incluyeron lo si-guiente:
(A) USTED NO PODR[Á] CANCELAR O REVOCAR ESTE ARRENDAMIENTO EN MOMENTO ALGUNO POR RAZ[Ó]N ALGUNAU
(B) USTED EST[Á] INCONDICIONALMENTE OBLIGADO A PAGAR TODOS LOS PAGOS DEL ARRENDAMIENTO Y *557 OTRAS CANTIDADES VENCIDAS POR EL T[É]RMINO COMPLETO NO IMPORTA LO QUE SUCEDA, AUN SI EL VEH[í]CULO LE ES ROBADO, DAÑADO O DESTRUIDO, SI TIENE DEFECTOS, O SI USTED YA NO PUEDE UTILIZARLO.
(C) LE ESTAMOS ARRENDANDO EL VEH[í]CULO A US-TED “COMO EST[Á]” Y NO LE HEMOS HECHO REPRESENTACI[Ó]N NI GARANT[Í]A, YA SEA EXPRESA O IMPLICITA (INCLUYENDO CUALQUIER GARANT[Í]A IMPLICITA DE FUNCIONALIDAD O CONVENIENCIA PARA UN PROP[Ó]SITO EN PARTICULAR), RELACIO-NADO CON EL VEH[í]CULO. NOSOTROS REPUDIAMOS TODAS DICHAS GARANTIAS DE CUALQUIER NATURA-LEZA QUE ESTAS SEAN. NOSOTROS ACORDAMOS EN TRANSFERIR A USTED TODAS LAS GARANTIAS SI AL-GUNA, HECHAS POR EL SUPLIDOR A NOSOTROS.
(F) SI EL VEH[í]CULO NO OPERA SEG[Ú]N REPRESEN-TADO POR EL SUPLIDOR, O SI EL SUPLIDOR O CUAL-QUIER OTRA PERSONA DEJARE DE PROVEER CUAL-QUIER SERVICIO, O SI EL VEH[í]CULO NO ES SATISFACTORIO POR CUALQUIER OTRO MOTIVO, US-TED PRESENTAR[Á] SU RECLAMACION [VINICA-MENTE CONTRA EL SUPLIDOR U OTRA PERSONA Y NO CONTRA NOSOTROS. (Énfasis suplido.)
El señor Andréu firmó, además, un “Recibo de entrega y aceptación”, certificando que el vehículo arrendado ope-raba satisfactoriamente, que lo aceptó de forma irrevocable y que sus obligaciones eran absolutas e incondicionales. Finalmente, también se otorgó un “Relevo de responsabili-dad” a beneficio de Popular Auto, exonerando al financia-dor de responsabilidad contra toda reclamación que sur-giera o estuviese relacionada a las garantías de título perfecto del vehículo.
Resulta de forma clara y precisa que el señor Andréu se comprometió a pagar las mensualidades del arrenda-miento por el término completo del contrato sin importar la condición del vehículo, incluyendo específicamente la eventualidad de que sufriera defectos mecánicos, como ocu-rrió en el caso de autos. A la vez, se le extendió al recurrido *558 el derecho de reclamar las garantías del vehículo directa-mente al vendedor, JP Motors.
Aun así, el señor Andréu cursó una carta a Popular Auto el 26 de junio de 2002 para anunciar que resolvía el con-trato de arrendamiento por el vehículo sufrir defectos ale-gadamente irreparables, por lo cual no pagaría otra men-sualidad, a la vez que dio el vehículo por entregado en las facilidades de Gómez Hermanos. Pasaron varios meses sin que el señor Andréu remitiera pago alguno, por lo cual Popular Auto eventualmente tomó posesión del vehículo y lo vendió en subasta, según provisto en el lease.
El Tribunal de Apelaciones erróneamente refrendó las acciones del recurrido al determinar que éste no tenía otro remedio que no fuera actuar como lo hizo y afirmar repeti-damente que el señor Andréu cumplió con sus obligaciones contractuales. Al dejar de pagar las mensualidades del arrendamiento vencidas con la expresada intención de li-berarse del término aún pendiente bajo el contrato, el se-ñor Andréu efectivamente infringió los términos y las con-diciones del lease al que se obligó voluntariamente a cumplir. Si bien es cierto que el señor Andréu llevó el ve-hículo en cuatro ocasiones a Gómez Hermanos para que se ajustara a la garantía, esto no le justificaba a cancelar uni-lateralmente el contrato de arrendamiento financiero con el arrendador, Popular Auto. Véase, por ejemplo, lo dis-puesto en el Art. 1208 del Código Civil, 31 L.P.R.A. sec. 3373 (“La validez y el cumplimiento de los contratos no pueden dejarse al arbitrio de uno de los contratantes”).
Por lo tanto, concluimos que el primer error señalado por Popular Auto fue cometido.
III
Una vez resuelta la controversia inicial, surge la inte-rrogante principal que nos ocupa, esto es, qué consecuen- *559 cias tiene el que un bien arrendado, estando aún en garan-tía, sufre defectos tan graves que motivan al arrendatario a entregar el bien al financiador prematuramente e incum-plir con los términos del lease. Según estas circunstancias, nos toca resolver si, no obstante los defectos del bien, el arrendador le puede reclamar al arrendatario la totalidad de la deuda restante conforme a lo pactado en el lease; o si, al contrario, está obligado a instar una acción de rescisión de compraventa en contra de la entidad responsable de honrar la garantía del bien arrendado, para así recuperar el monto adeudado. Contestamos lo primero en la afirmativa. Veamos.
A. Ley para Regular Contratos de Arrendamientos
Comenzamos el análisis acudiendo directamente al estatuto que rige el contrato ante nos. La Ley para Regular Contratos de Arrendamientos provee para que un arrendador financiero recupére completamente su inversión en un arrendamiento en la eventualidad de que el arrendatario incumpla con el lease y entregue el bien arrendado voluntariamente al arrendador:
Cuando el arrendatario incumpla con el arrendamiento y el arrendador obtiene la posesión del bien arrendado, sea me-diante entrega voluntaria o reposeído por vía judicial, éste po-drá recibir ofertas de compra de terceros y notificará de las mismas al arrendatario mediante carta certificada. ... Si luego que el arrendador obtuviere la posesión del bien arrendado, éste no lograre obtener ofertas de compra de terceros dentro de un término de quince (15) días, notificará de este hecho al arrendatario y le otorgará un período de quince (15) días para que consiga un comprador o pague lo adeudado. ...
... [S]i existe una deficiencia por la diferencia entre la can-tidad a recibirse por la venta y el balance adeudado por el arrendatario, éste pagará dicha diferencia al arrendador. (En-fasis suplido.) 10 L.P.R.A. sec. 2424.
Con esta disposición estatutaria, la Legislatura protegió los intereses de los arrendadores financieros contra la po- *560 sibilidad de no recuperar su riesgo e inversión total en los arrendamientos. Según la ley, un arrendador que advenga en la posesión del bien arrendado antes de que se cumpla con el término del lease, podrá obtener el balance pen-diente del arrendamiento cancelado de una de dos maneras. Tiene la opción de vender el bien a un tercero, o, de no ser posible la venta por falta de ofertas de compra, o si queda una deficiencia en el balance adeudado después de esa venta, el arrendador podrá recuperar la diferencia adeudada directamente del arrendatario. Notamos que el estatuto no incluye excepción alguna a este procedimiento de recuperación financiera, ni siquiera si el incumpli-miento del lease y la entrega del bien fueron ocasionados por los vicios ocultos del bien mueble.
Previamente resolvimos que la entrega del bien arrendado en el caso de incumplimiento de un contrato de arrendamiento financiero no compensa adecuadamente al arrendador financiero por su riesgo e inversión en el negocio otorgado. Class v. Vehicle Eqmnt. Leasing Co., supra, pág. 203. En ese caso, aunque los hechos precedieron la aprobación de la Ley para Regular Contratos de Arrendamientos, nos valimos de su historial legislativo para diferenciar la institución de arrendamiento financiero de un contrato de venta condicional. Id., págs. 199-202. En esa ocasión, nos resultó informativo que el Informe de la Asociación de Bancos de Puerto Rico de 15 de marzo de 1994 sobre el P. de la C. 702 —el cual fue acogido e incorporado en el proyecto de ley que luego se convirtió en la Ley para Regular Contratos de Arrendamientos— sostuvo que “[l]a entrega del bien previo a la terminación del contrato o el pago de las sumas pendientes no cubre los costos y gastos incurridos por el [a]rrendador”, por lo que un arrendatario debe ser responsable por su obligación total según pactada, íd., pág. 201.
Por otro lado, dado que conforme al Art. 1044 del Código Civil, 31 L.P.R.A. sec. 2994, todo contrato tiene *561 fuerza de ley entre las partes contratantes, es necesario también examinar el contrato de arrendamiento financiero bajo el cual se define la relación jurídica entre el arrenda-dor y arrendatario para determinar si los contratantes es-tipularon qué ocurriría, o quién respondería, en la even-tualidad de que el bien arrendado sufriera de defectos. Si, como en el caso de autos, el lease provee que el arrendador está completamente exonerado de responsabilidad por cualquier garantía del bien arrendado —cláusula que ya determinamos es válida en Meyers Bros. v. Gelco, supra— entonces la presencia de defectos en el bien arrendado no altera la responsabilidad a la cual el arrendatario volunta-riamente se comprometió de continuar honrando su obliga-ción de pagar el arrendamiento hasta su fin. Véase Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. De igual ma-nera, la presencia de esos defectos tampoco altera el dere-cho del arrendador de cobrar la financiación del bien en su totalidad, tal como fuera pactado.
B. Obligación de instar o respaldar la rescisión de la com-praventa del bien arrendado
No obstante lo provisto por la Ley para Regular Contra-tos de Arrendamientos y la presencia de un lease que re-leva al arrendador de toda garantía relacionada al bien arrendado, el Tribunal de Apelaciones concluyó en su dic-tamen que el arrendador, Popular Auto, tenía la obligación de instar o respaldar una reclamación contra el vendedor del vehículo para rescindir la compraventa de la unidad al amparo de la Ley Complementaria de Garantías. No tiene razón.
La Ley Complementaria de Garantías disponía, en lo pertinente, que si un manufacturero o su agente de servicio autorizado no podía ajustar un vehículo a la garantía después de un número razonable de intentos, el manufacturero, en cuarenta días, tenía que comprar nueva- *562 mente el vehículo y el consumidor tendría un derecho incondicional para escoger entre un rembolso del precio de compra, menos la compensación razonable por uso o reem-plazo de vehículo. 10 L.P.R.A. sec. 2069(b)(1). La definición de consumidor incluía a un adquiriente o arrendatario de un vehículo de motor utilizado principalmente para fines personales, familiares o de la casa. 10 L.P.R.A. see. 2066(g). Se presumía que un número razonable de intentos habían sido emprendidos para ajustar el vehículo a la ga-rantía si el vehículo no estuvo disponible por razón de re-paración de uno o más vicios por el agente de servicios autorizado del manufacturero por un total acumulativo de treinta días o más. 10 L.P.R.A. sec. 2069(c)(2).
Sin embargo, una lectura detenida de la Ley Comple-mentaria de Garantías revela que nada disponía sobre una obligación del arrendador de respaldar una acción del arrendatario contra el manufacturero.
Por otro lado, es menester señalar que la Ley para Regular Contratos de Arrendamientos también contiene una sección titulada “Garantías”, la cual dirige cómo debe presentarse una reclamación relacionada a la garantía del bien arrendado contra el proveedor. No obstante, tampoco les impone una obligación a los arrendadores al respecto. Más bien, la Ley para Regular Contratos de Arrendamientos les facilita a los arrendatarios el instar una reclamación de garantía contra los proveedores. Así pues, en lo pertinente, dispone:
El arrendatario tendrá derecho a reclamar del proveedor el cumplimiento de las obligaciones, promesas y garantías, así como también podrá reclamar todos los derechos de sanea-miento por vicios ocultos sobre el bien arrendado. Si el arren-datario no reclama los derechos que tiene contra el proveedor, el arrendador podrá reclamarlos. (Enfasis suplido.) 10 L.P.R.A. see. 2412.
Tal como está escrita, la clara letra de la ley no obliga al *563 arrendador a reclamar el cumplimiento de las garantías contra el proveedor. Es únicamente después de que un arrendatario decide no ejercitar una reclamación bajo la garantía que el arrendador puede hacerlo.
Analizados los Arts. 14 y 26 de la Ley para Regular Contratos de Arrendamientos, supra, en conjunto con la Ley Complementaria de Garantías, no surge que el dere-cho del arrendador para recuperar la deuda del arrendata-rio en el caso en que el bien arrendado sea defectuoso de-pende de si trató de rescindir la compraventa. Por ende, erró el Tribunal de Apelaciones al resolver que un arren-dador está obligado a instar o respaldar una acción contra el proveedor para hacer cumplir la garantía y, de no ser posible, rescindir el contrato de compraventa del bien defectuoso. Más bien, la interpretación clara y correcta de las leyes aplicables es que un arrendatario puede reclamar por sí mismo la garantía del bien arrendado del proveedor, así como el saneamiento por vicios ocultos, sin que esa re-clamación dependa del arrendador de manera alguna.
En fin, según la Ley Complementaria de Garantías y la Ley para Regular Contratos de Arrendamientos, un arrendatario ciertamente goza de protecciones en la eventualidad de que el bien arrendado sufra de vicios que lo obligue a optar por la terminación temprana del arrendamiento. No obstante, las leyes no permiten que el arrendatario viole sus responsabilidades contractuales con el arrendador. El arrendador tiene el derecho de recuperar la deuda remanente de un lease directamente del arrendatario que incumpla con el contrato de arrendamiento y entregue el bien arrendado prematuramente debido a sus defectos. De igual manera, el financiador no viene obligado a tomar acciones contra el vendedor para rescindir la compraventa del bien por los defectos irreparables. La Ley para Regular Contratos de Arrendamientos le da la opción al arrendador de decidir cómo recuperar lo que invirtió en *564 el otorgamiento del lease, de esta manera guardando armo-nía con el fin del lease de no perder el dinero o inversión del arrendador.
IV
Expuesta y discutida la normativa aplicable al caso de autos, pasamos ahora a resolver conjuntamente las contro-versias restantes ante nuestra consideración.
A. Obligación directa del arrendatario de pagar al arren-dador
Según notamos, el contrato de arrendamiento financiero del caso de autos colocaba todo riesgo de pérdida o menos-cabo del uso del bien sobre el señor Andréu como arrendatario. A la vez, éste aseguró que completaría el pago de las sesenta mensualidades incondicionalmente. Así pues, Popular Auto exitosa y válidamente contrató para asegurarse de que recuperaría la totalidad de la fi-nanciación del vehículo del señor Andréu, aunque el vehí-culo tuviera defectos o se entregara de manera prematura.
Así las cosas, el señor Andréu entregó el vehículo a Popular Auto debido a los defectos mecánicos mencionados y suspendió el pago de los cánones vencidos bajo el contrato, incumpliendo así con el lease. Luego, el señor Andréu in-tentó transferir su obligación directa de pagar el balance debido bajo el arrendamiento a JP Motors mediante una demanda de rescisión de la compraventa del vehículo ba-sada en la Ley Complementaria de Garantías o, en la al-ternativa, en la doctrina de saneamiento por vicios ocultos.
Sin embargo, el señor Andréu carecía de legitimación activa para invocar la Ley Complementaria de Garantías por no ostentar el título de arrendatario al momento cuando invocó estos derechos. Según su carta fechada el 26 de junio de 2002 y su curso de acción al entregar el vehí-culo y dejar de pagar las mensualidades del lease, el señor *565 Andréu unilateralmente resolvió el arrendamiento finan-ciero otorgado con Popular Auto. Esto causó que ya no cua-lificara bajo la definición de “consumidor” de la Ley Com-plementaria de Garantías, y que consecuentemente ya no gozara de los privilegios o las protecciones que la ley exten-día a arrendatarios frente a un proveedor que vendió un bien que no se ajustara a la garantía. El señor Andréu debió haber continuado pagando el arrendamiento para po-der retener su legitimación activa para rescindir la com-praventa del vehículo y así intentar resolver el lease me-diante este estatuto en particular. Véase Meyers Bros. v. Gelco, supra, pág. 125 (notando que en Francia “la resci[s]ión del contrato entre el proveedor y la financiera provoca el desplome del contrato entre ésta y el usuario, por defecto de causa, aunque el segundo contrato no puede rescindirse sin actuar contra el primero”, pero negando en-trar en ese aspecto del arrendamiento financiero).
Cuando el señor Andréu entregó el vehículo e incumplió con el lease, no solo se desvinculó del vehículo para efectos de poder reclamar la garantía del vehículo de JP Motors según la Ley Complementaria de Garantías,(16) sino que también se activó la See. 2424 de la Ley para Regular Con-tratos de Arrendamientos, permitiendo al arrendador, Popular Auto, cobrarle el remanente adeudado luego de ha-ber vendido el bien. Sin la capacidad de poder rescindir la compraventa del vehículo mediante la Ley Complementa-ria de Garantías, la obligación del señor Andréu de pagar toda la financiación del vehículo de acuerdo con el arren-damiento financiero permaneció intacta, sin importar que *566 el vehículo tuviera defectos. Por las razones esbozadas, Popular Auto no tenía la obligación de llevar una acción de recisión de la compraventa del vehículo contra JP Motors para relevar al arrendatario-deudor del contrato y podía reclamar el balance directamente del señor Andréu.
Dado que la entidad financiera sí podía recuperar el dinero debido por parte de su arrendatario, procedía en efecto declarar “con lugar” la reconvención del peticionario contra el señor Andréu.(17)
B. Autoinflicción de daños
Por consiguiente, en respuesta al tercer error señalado por Popular Auto, encontramos que el Tribunal de Apela-ciones erró al determinar que éste se autoinfligió sus daños al vender el vehículo en vez de unirse a la demanda de rescisión de la compraventa del vehículo. La doctrina de autoinflicción de daños surge cuando una parte promo-vente se coloca voluntariamente en una posición que le causa un perjuicio irrazonable. Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254, 270 (2007), citando a Asoc. Res. Baldrich, Inc. v. J.P. de P.R., 118 D.P.R. 759, 772 (1987).
Popular Auto actuó conforme a sus derechos estatuta-rios y contractuales al vender el vehículo y cobrarle el balance del arrendamiento al señor Andréu. No se colocó en una posición que le causara perjuicio irrazonable, sino que, por el contrario, sus acciones mitigaron el daño causado por el señor Andréu al abruptamente intentar rescindir el contrato sin pagar lo adeudado. Popular Auto desconocía si recuperaría lo adeudado por el recurrido, quien incumplió con el contrato otorgado. Al vender el vehículo, al menos se aseguró de recuperar una porción de esa deuda por parte *567 de un tercero. Posteriormente, amparado en la Ley para Regular Contratos de Arrendamientos, procedió a requerir el pago de la deficiencia de parte del recurrido.
C. Relevo de responsabilidad de JP Motors
Según resolvimos, el señor Andréu, como arrendatario, tiene la responsabilidad directa de pagar la deuda a la cual se obligó frente al arrendador, Popular Auto. Entramos ahora a explicar por qué el vendedor de la unidad, JP Motors, no tenía esa responsabilidad frente a Popular Auto en concepto del relevo de responsabilidad, tal como resolvió el Tribunal de Apelaciones. Para ello encontramos necesario discutir el alcance del relevo de responsabilidad de JP Motors, el cual, en su totalidad, consiste de lo siguiente:
JOS[É] A. ANDRÉU-FUENTES (Arrendatario), por la pre-sente reconoce que Popular Leasing & Rental, Inc., adquirió un 1998 A-6 Audi WAUBA24B4WN138257, conforme a las ins-trucciones de JOS[É] A. ANDRÉU-FUENTES (Arrendatario). En referencia a esta transacción, JP MOTORS (C) (Distribui-dor) por la presente garantiza a ambos Popular Leasing & Rental, Inc. y JOS[É] A. ANDRÉU-FUENTES (Arrendatario) que todos los arbitrios, impuestos o cualquier otra carga que pese sobre el vehículo arriba mencionado, han sido pagados y que JP MOTORS (C) (Distribuidor) tiene título perfecto y ab-soluto sobre dicho vehículo, libre de todo gravamen, cargas o de cualquier otro defecto de título.
JP MOTORS (C) (Distribuidor) por la presente acuerda defender, indemnizar, salvar, proteger y en general relevar a Popular Leasing & Rental, Inc. y JOS[É] A ANDRÉU-FUENTES (Arrendatario), sus cesionarios, agentes y empleados, de toda reclamación, acción, procedimiento, gastos, daños, lesiones, responsabilidades o pérdidas de cualquier tipo o naturaleza, ya sea que estas resulten de la exclusiva negligencia del Arrendador o de otro modo e incluyendo, pero sin limitarse a, honorarios de abogados, costos y gastos de litigio, pagos de transacción y cantidades pagadas para satisfacer sentencias, que surjan de o resulten directa o indirectamente de o estén relacionados con las garantías aquí mencionadas. (Énfasis suplido).
El Art. 1233 de nuestro Código Civil, 31 L.P.R.A. see. 3471, instruye a que cuando vayamos a interpretar un *568 contrato, si los términos son claros y no dejan duda sobre la intención de los contratantes, se aplicará un sentido literal a sus cláusulas. Ahora bien, si las palabras utilizadas en el contrato parecen ser contrarias a la intención evi-dente de los contratantes, entonces prevalecerá la inten-ción sobre aquéllas. C.F.S.E. v. Unión de Médicos, 170 D.P.R. 443, 450 (2007) (“[S]i los términos de un contrato o de una cláusula contractual ... son suficientemente claros como para entender lo que se pacta, hay que atenerse al sentido literal de las palabras y, por ende, los tribunales no pueden entrar a dirimir sobre lo que las partes alegada-mente intentaron pactar al momento de contratar”).
En el caso de autos, el relevo de responsabilidad citado se expresa de forma clara y precisa, y no arroja duda al-guna sobre la intención que compartieron JP Motors y el señor Andréu al firmarlo. Ninguna parte argumentó ni presentó prueba para demostrar que las palabras de ese relevo fueran contrarias a la intención de los contratantes. Por lo tanto, nos ceñimos al sentido literal de lo expresado.
Una lectura somera de la cláusula en cuestión nos lleva inevitablemente a concluir que ésta se limita a garantizar los aspectos atenientes al título del vehículo. Es decir, cer-tificar la legitimidad del título, así como aseverar que no pesaban sobre él ningún tipo de carga o gravamen. De otra parte, JP Motors se comprometió a indemnizar al arrenda-dor y al arrendatario únicamente en la eventualidad de una reclamación suscitada exclusivamente con relación a esa garantía en particular.
Por lo tanto, el Tribunal de Apelaciones y el TPI erraron en sus respectivos dictámenes al encontrar que, a base del relevo arriba indicado, JP Motors le era responsable a Popular Auto por el balance pendiente del arrendamiento o que tenía que indemnizar al señor Andréu por ese balance más los días que éste estuvo privado del uso de su vehículo debido a los vicios de ese, habida cuenta de que este as-pecto en particular no estuvo contemplado en el relevo de responsabilidad en controversia.
*569 Sin embargo, JP Motors no estaba relevado de toda res-ponsabilidad hacia el señor Andréu por los daños incurri-dos por éste a causa de los vicios ocultos del vehículo, sino que no procedía el resarcimiento deseado por parte del pro-veedor del vehículo según el relevo de responsabilidad en controversia.
V
A base de lo anterior, se dictará Sentencia para revocar el dictamen emitido por el Tribunal de Apelaciones y reins-talar la Sentencia Sumaria Enmendada dictada por el Tribunal de Primera Instancia, según aquí modificada. Se de-vuelve el caso al Tribunal de Primera Instancia para que el señor Andréu tenga oportunidad de probar sus daños contra JP Motors, según alegado en la demanda.

Se dictará sentencia de conformidad.

La Jueza Asociada Señora Piol Matta y la Juez Asociada Rodríguez Rodríguez concurrieron sin opinión escrita. El Juez Presidente Señor Hernández Denton se inhibió.

 Según el contrato de arrendamiento, el precio del vehículo se pactó en cua-renta mil dólares ($40,000), y los costos de “origination” (origination fee) sumaban unos cuatrocientos veinticinco dólares ($425) adicionales.

 Véase Cláusulas 7(C) y 7(F) del contrato.

 Véase Cláusulas 7(A) y 7(B) del contrato.

 Aunque surgen dos fechas diferentes para la expiración de la garantía del vehículo en el expediente, es decir, el 2 de marzo de 2002 y el 15 de agosto de 2002, para propósitos del recurso esta inconsecuencia es inmaterial, ya que el señor An-dréu reclamó el arreglo de su vehículo oportunamente bajo cualquiera de los dos supuestos.

 Apéndice, págs. 62 y 66-67.

 Notamos que en el expediente surgen varias fechas en que alegadamente ocurrió este evento, incluyendo, además, el 1 y el 2 de agosto de 2002. Apéndice, págs. 105 y 115.

 También nombró a Audi AG o Audi North America como parte codemandada, aunque del expediente se desprende que esta parte aparentemente nunca fue emplazada.

 Popular Leasing también sometió una demanda contra coparte contra JP Motors y Gómez Hermanos para recuperar el monto de la deuda en la eventualidad que el señor Andréu prevaleciera y se decretase la rescisión del contrato de compra-venta del vehículo.

 Ley Núm. 330-2000 (10 L.P.R.A. ant. see. 2066 et seq.).

 Ley Núm. 529-2004.

 Arts. 1373-1375 del Código Civil, 31 L.P.R.A. sees. 3841-3843.

 Ley Núm. 76-1994 (10 L.P.R.A. 2401 et seq. (Supl. 2011)), según enmendada.

 En cuanto a Gómez Hermanos, el TPI especificó, y el Tribunal de Apelacio-nes luego afirmó, que según ambas teorías de ley propuestas por el señor Andréu, a esa entidad no le correspondía responsabilidad alguna por el hecho de que el vehí-culo presentara vicios que no se pudieron curar de manera oportuna. Véase 10 L.P.R.A. sec. 2069(b)(1).

 Véase también el Alegato de JP Motors ante el Tribunal de Apelaciones, pág. 19.

 Según el expediente, estos hechos no están en controversia.

 Debe constar que esta determinación no significa que el señor Andréu quedó desprovisto de todo remedio frente al manufacturero o vendedor del vehículo, o que éstos no le responden al señor Andréu por los defectos mecánicos del vehículo. El recurrido tiene el derecho a ser resarcido por daños y peijuieios por JP Motors y/o Audi, tal como señaló en su demanda. Cabe señalar, sin embargo, que como indicá-ramos, en el expediente hay información no corroborada de que JP Motors dejó ya de operar y es insolvente, en cuyo caso el señor Andréu podría confrontar problemas prácticos en obtener indemnización de ese proveedor por cualquier daño que hubiera podido sufrir. Véase, también, lo indicado en el esc. 7.

 La cuarta controversia planteada por Popular Auto sostiene que la Senten-cia del Tribunal de Apelaciones, al adoptar la sentencia sumaria original del TPI, no dispone de forma alguna sobre su reconvención, por lo que esa alegación continúa vigente y, consiguientemente, el remedio es incompleto. Reconocida la validez jurí-dica de la reconvención de Popular Auto contra el señor Andréu, esa controversia se ha tornado académica. Por lo tanto, no es necesario adentrarnos en un análisis jurí-dico de este señalamiento de error.